LASSER, P.J.T.C.
In this action taxpayer contests 52 local property tax assessments imposed for 1985 by five municipalities in which taxpayer owns facilities and trackage. There are two issues: (1) exemption from local property taxation, and (2) valuation. The valuation issue is being held until disposition of the exemption issue. These cases were consolidated for the purpose of hearing and determining the exemption issue. The Attorney General of the State of New Jersey was permitted to intervene on this issue because the Division of Taxation had investigated and determined that the subject property was not used for railroad purposes and therefore was subject to local property taxation.
Taxpayer contends that its facilities and trackage, consisting of a 21.5-mile section of railroad line from Smoke Rise, west of Butler, New Jersey, to Sparta Junction, New Jersey, located in the five municipalities, are exempt from local property taxation under N.J.S.A. 54:29A-11 as “property used for railroad purposes.” Taxpayer has agreed, on the record, that if it is determined that the property is exempt from local property taxation, it will pay to the State of New Jersey the tax that would have been due to the State for the year 1985 if the subject property had been assessed for railroad purposes.
To qualify for an exemption from local property taxation for 1985 the property must have been “used for railroad purposes” on January 1, 1984. N.J.A.C. 18:23-3.5.
Taxpayer, New York Susquehanna and Western Railway Corp. (NYS & W), was incorporated as a subsidiary of the Delaware Otsego Corporation on March 17, 1980 for the purpose of acquiring all of the assets of the bankrupt New York Susquehanna and Western Railroad Co. The New Jersey Department of Transportation (NJDOT) wanted the rail lines that were owned by the New York Susquehanna and Western *629 Railroad, Co. to remain in operation. NJDOT solicited bidders for the rail line and interested Delaware Otsego in the purchase. Federal funds were made available through the New Jersey Economic Development Authority, which granted NYS & W a low interest loan of $2.5 million to assist in the purchase of the bankrupt railroad company’s assets. NYS & W entered into an agreement in 1980 with the trustee in bankruptcy to purchase these assets, which included the railroad main line from Croxton Yard (Jersey City), milepost 0, extending west to Sparta Junction, New Jersey, milepost 59.9. NYS & W filed an application with the Interstate Commerce Commission (ICC) for permission to operate all of the rail lines of the bankrupt company, and a temporary permit was issued effective September 2, 1980. Thereafter, NYS & W received a certificate of public convenience and necessity, which allowed it to operate the entire rail line between Croxton Yard and Sparta Junction.
The railroad main line was in poor condition at the time of purchase. The tracks from Croxton Yard to Little Ferry had not been used for several years. From Little Ferry west to Butler, the tracks were operational but at a restricted speed limit of ten miles an hour. The subject tracks from Smoke Rise to Sparta Junction were out of service. This portion of the main line, from mile post 47 to mile post 59.9, had been transferred from state to local assessment in 1971. In 1975, the portion of the line from mile post 47 west to the Vernon-Stockholm Road in Hardyston Township was reclassified as class I railroad property because it was being used by the Morris County Central Railroad Co. This portion was returned to local assessment in 1983 following discontinuance of use by Morris County Central, and at the same time, the portion from mile post 47 east to Smoke Rise was returned to local assessment. Therefore, beginning with the year 1983, the 21.5 miles of rail line from Smoke Rise to Sparta Junction were subject to local property taxation.
NYS & W initiated the rehabilitation of its tracks in 1980. The NJDOT contributed $1.5 million in matching funds toward this rehabilitation. Walter Rich, President of NYS & W, testi *630 fied that NYS & W made a long-term commitment to the State to operate the railroad and, if it did not, to pay back the rehabilitation funds. This commitment is embodied in an October 15, 1982 sworn statement by Rich, that the corporate policy of NYS & W on that date was “to rehabilitate and operate the track extending from Butler, New Jersey, to the New York State line and beyond for railroad purposes as the main line of the New York, Susquehanna and Western Railway Corporation as part of our commitment to the various state agencies and the State Economic Development Agency.”
The rehabilitation fund to which NJDOT contributed was used to repair the tracks from Little Ferry to Butler. These tracks were repaired first because most of the NYS & W customers were concentrated in that area. No significant funds were spent on the Smoke Rise to Sparta Junction track-age at that time. In fact, between 1980 and 1985, NYS & W spent less than $50,000 on minimal maintenance of the tracks between Butler and Sparta Junction.
In 1982, NYS & W engaged in transactions which would enable it to become a competitor of Conrail in the New York-New Jersey railroad market, and at that time Conrail encouraged this competition. To accomplish this goal, it was necessary for NYS & W to make a connection at Binghamton, New York for rail traffic to the west. Tracks between Franklin, New Jersey, and Binghamton, New York, were purchased from Conrail, followed by acquisition of track rights from Sparta Junction to Franklin. Because the NYS & W tracks from Butler to Sparta Junction were not operational, NYS & W entered into an agreement with Conrail to use its tracks between these points. Mr. Rich testified that there was an understanding between NYS & W and the NJDOT under which it was agreed that NYS & W would maintain operating authority over its tracks between Butler and Sparta Junction while using Conrail tracks between Butler and Sparta Junction because of the significant problems in rehabilitating this section of the NYS & W tracks.
*631 In 1982 NYS & W began preparations for the repair of two bridges (bridge 38.75 and bridge 39.32) located west of Butler.[1] Permits were filed with the appropriate state agencies to obtain environmental approval for the repairs. A contract was entered into with the Standard Engineering Corporation of Albany, New York, to design plans for the new bridges, and invoices for these services were rendered in March, April and May 1982.
In 1983, NYS & W applied, under the state rail plan, for $2,582,360 to rehabilitate numerous bridges between Butler and Sparta Junction, but these funds were not granted. In May 1983 NYS & W engaged a contractor to repair a washed-out area of track at Smoke Rise.
In late 1984, NYS & W contracted to be the local rail carrier for Sea-Land Corporation between Tacoma, Washington, and the New York metropolitan area. Sea-Land had been a customer of Conrail, and Rich testified that, in retaliation, Conrail cancelled its haulage agreement with NYS & W between Butler and Sparta Junction in the fall of 1985.
From 1980 through 1985 the tracks between Smoke Rise and Sparta Junction were not in actual operation. In November 1985, NYS & W commenced a $10 million rehabilitation of its rail line. Approximately $3.5 to $4 million was allocated to the line between Butler and Sparta Junction, and this work began in May 1986, with a targeted completion date of October 1986.
Taxpayer claims that property used for railroad purposes includes property that is fairly anticipated to be used for railroad purposes and that the foregoing facts demonstrate that, on January 1, 1984, NYS & W anticipated the use of the rail line between Smoke Rise and Sparta Junction. The State argues that the property was not actually used for railroad purposes on that date and therefore is subject to local property taxation for 1985.
*632 Taxation of railroad property in New Jersey is governed by the Railroad Tax Law of 1948 (N.J.S.A. 54:29A-1 et seq.). This statute distinguishes between property “not used for railroad purposes” and property “used for railroad purposes.” Property not used for railroad purposes is assessed and taxed by the local taxing district in the same manner and at the same rate as the taxable property of other owners in the taxing district. N.J.S.A. 54:29A-4. Property used for railroad purposes is taxed by the State in lieu of all other state or local taxation. N.J.S.A. 54:29A-7; N.J.S.A. 54:29A-11. Property used for railroad purposes but classified as (a) main stem, (b) tangible personal property and (c) facilities used in passenger service are exempt from both state and local taxation. N.J.S.A. 54:29A-7. The purpose of the Railroad Tax Law is to commit the assessment of property used for railroad purposes to a state agency to avoid application of varying methods and standards of valuation by municipalities in which the property is located. Jersey City v. Armed Realty Co., 45 N.J.Super. 49, 131 A.2d 549 (App.Div.1957).
The statutory distinction between land used and land not used for railroad purposes has existed since 1884 when the Legislature enacted L. 1884, c. 101, p. 142, “An act for the taxation of railroad and canal property,” the predecessor to the current statute. The 1884 statute provided for state taxation of railroad property used for railroad purposes.[2] Several states passed railroad property tax laws during the latter part of the 19th century, a period of railroad expansion. A variety of these statutes and the differing opinions among the state courts have resulted in considerable diversity in the treatment of railroad *633 property for purposes of local property taxation. See Annotation, 80 A.L.R. 252.
New Jersey courts have chosen to determine whether property is “used for railroad purposes” by considering not only the actual present use of the property, but also the reasonably anticipated use of the property. This approach grew out of an awareness of the stages in the development of a railroad. United New Jersey Railroad and Canal Co. v. Jersey City, 55 N.J.L. 129, 26 A. 135 (E. & A. 1892). In United New Jersey Railroad, the Court found that the vacant portion of a right-of-way was used for railroad purposes where it was held in anticipation of a demand for increased trackage and other structures incidental to the operation of a railroad. The anticipation of future use was demonstrated by the good faith operation of tracks over part of the right-of-way, and the fact that the railroad had not devoted the property to non-railroad use. The Court distinguished partial present use and anticipated future use of land from land acquired in speculative anticipation of future needs. Land acquired in speculative anticipation would be taxed locally.[3]
In New Jersey Junction Railroad Co. v. Jersey City, 63 N.J.L. 120, 43 A. 577 (Sup.Ct.1899), the court developed a test to determine whether property was used for railroad purposes, based in part on the holding in United New Jersey Railroad. *634 This test focuses on the degree of certainty that property owned by a railroad will be used for railroad purposes in the future. The New Jersey Junction court held that three tracts of land were used for railroad purposes. The court found that the first tract, a side hill adjoining the track, satisfied the reasonable anticipation test because the evidence indicated that it could not be used for any purpose other than railroad use. Railroad tracks used for coal delivery were located on the second tract. The third tract was an unimproved meadow. The main railroad tracks were carried over this meadow by a 20-foot high trestle, and the railroad company was planning to fill in the meadow under the trestle. The court was satisfied that holding the meadow for this purpose was an anticipated railroad use.
*633 The tests to be applied are whether these lands are now used or devoted to railroad purposes, or held for fairly anticipated railroad purposes and emergencies and purposes incident thereto.
If these lands are either used for railroad purposes, or held by the railroad company solely for anticipated railroad purposes, they are then taxable only by the state board of assessors as railroad property, and are not subject to local taxation, [at 121, 26 A. 135]
*634 In P & R Railway Company v. Woodbridge Township, 91 N.J.L. 180, 102 A. 392 (E. & A. 1917), the local taxing district levied a tax on railroad crossties which belonged to the railroad company and which were being treated in a creosoting plant located within the taxing district. The crossties were shipped to the plant solely for this purpose. After treatment, they were promptly distributed along the railroad’s right-of-way for use by the railroad. The Court held that the erossties were intended for railroad use and therefore were exempt from local taxation. In defining the scope to be given the words “used for railroad purposes,” the Court stated:
Since the decision by this court in 1892 of the case of United New Jersey Railroad and Canal Co. v. Jersey City, 55 N.J.L. 129 [26 A. 135] it has been consistently held ... that property owned by a railroad corporation, which has . been acquired and is held for a railroad use to which it is intended to be subjected in the near future, is property used for railroad purposes within the meaning of the Railroad Tax Law, although such use has not actually been begun.... [at 181, 102 A. 392]
The burden is on NYS & W to show that on January 1, 1984 the property either was used for railroad purposes or such use was fairly anticipated. Taxpayer argues that the burden is on the State to show that the property was not used for railroad purposes, citing United New Jersey Railroad and Canal Co. v. Jersey City, supra. Central to that case was the *635 1868 statutory grant, which the court considered a contract and construed its terms as requiring the State to show that the property was not used for railroad purposes. There is no statutory grant under consideration in the subject case. The burden is on the taxpayer to establish exemption from local property taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 172 A.2d 420 (1961); Beth Israel Cemetery v. Woodbridge Tp., 1 N.J.Tax 149 (Tax Ct.1980), aff’d 180 N.J.Super. 508, 435 A.2d 1159 (App.Div.1981); McTague v. Monroe Tp., 1 N.J.Tax 66 (Tax Ct.1980); In re New York Bay Railroad Co., 75 N.J.L. 111, 66 A. 916 (Sup.Ct.1907).
To determine whether the subject property met the “fairly anticipated use for railroad purposes” test on January 1, 1984, it is necessary to evaluate its use over a period of years in relation to the operation of the railroad as a whole.
The corporate policy of NYS & W in 1982 was to rehabilitate and operate all of its tracks, including the tracks on the property in issue. NYS & W committed itself to this policy when it accepted state funds. Beginning in 1982, NYS & W extended its track rights to Binghamton, New York, in an effort to expand its business and compete with Conrail. The subject property is a 21.5-mile section of the main line from Croxton Yard (Jersey City) to Binghamton, New York. It is true that as of January 1, 1984, the assessment date, NYS & W had the benefit of an agreement with Conrail which made use of its own tracks between Smoke Rise and Sparta Junction unnecessary. However, subsequent events confirm that NYS & W correctly anticipated that it could not permanently rely on its agreement with Conrail to use Conrail tracks as a substitute for this 21.5-mile section. In late 1984, after the assessment date, NYS & W entered into the contract with Sea-Land Corporation. Conrail responded by cancelling the track use agreement.
The evidence also indicates that NYS & W was taking steps on January 1, 1984 to make the subject tracks operational. In 1982 NYS & W began preparing for rehabilitation of the *636 subject portion of its line by applying for state construction permits and contracting for new bridge designs. The plans to repair bridges 38.75 and 39.32 indicate NYS & W’s intention to operate tracks west of Butler. In 1983 NYS & W applied for state funds for the repair of numerous bridges along that part of the line. The fact that funds were not granted does not detract from the fact that NYS & W was attempting to raise funds to rehabilitate that track, further indicating an intention to use that portion of its rail line. Also in 1983, NYS & W contracted to repair the washed-out area of track near Smoke Rise.
These facts distinguish this case from cases holding that property was not used for railroad purposes. In In re Assessment of Property of Central R.R. Co., 72 N.J.L. 86, 59 A. 1062 (Sup.Ct.1905), the court held that property was not intended to be used for railroad purposes where the plans for use of the property were indefinite and future use of the property as a railroad yard was uncertain. In In re New York Bay Railroad Co., supra, the court held that property was not used for railroad purposes where there was an unreasonable delay in the construction of a new railroad. In that case, construction of the railroad ceased for ten years, during which time the property was used for farming purposes.
I find that on January 1,1984 the subject property was “used for railroad purposes” because the facts demonstrate that use for railroad purposes was fairly anticipated on that date, and therefore the subject property is exempt from local property taxation for 1985.
The Clerk of the Tax Court is directed to enter judgments cancelling the 52 local property tax assessments in the within cases, and upon refund of the sums paid to the municipalities, NYS & W is directed to pay to the State of New Jersey the amount of tax due to the State for the year 1985 if the subject property had been assessed for railroad purposes. The parties will agree on the amount to be paid to the State, in accordance with R. 8:9-3.

 It is not clear from the evidence whether these bridges are located on, or east of, the property in issue.

 It was the practice of the New Jersey Legislature, prior to the 1884 act, to grant land to railroads and make that property exempt from local taxation so long as the railroad did not use the property for other than railroad, canal, depot, transhipping or landing purposes. L. 1868, p. 551. See United New Jersey R.R. v. Jersey City, 57 N.J.L. 563 (Sup.Ct.1895), which held that the 1884 statute did not modify the 1868 grant. See also State v. Newark, 25 N.J.L. 315 (Sup.Ct.1855), which describes a tax exemption included in the railroad company’s corporate charter.

 See also State, Morris and Essex Railroad Co. v. Haight, 35 N.J.L. 40 (Sup.Ct.1870), which rejected an actual use test, holding that where a railroad company has not completed its road and appendages and is engaged in the work of construction, the local property tax exemption will extend to property not actually used for other purposes and which, when finished, is necessary for the business of the railroad company.