THE NEW JERSEY STATE LEAGUE OF MUNICIPALITIES, AN ASSOCIATION NOT FOR PROFIT, AND RICHARD B. NASHEL AND SUSAN B. NASHEL, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued September 8, 1986—Decided March 26, 1987.

*Edward G. Rosenblum* argued the cause for appellants (*Rosenblum & Rosenblum,* attorneys).

*Harry Z. Haushalter,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

In this case we must primarily resolve an apparent conflict between two provisions of the taxation article of the New Jersey Constitution. One requires taxation of all real property by uniform rules and the same standard of value, the other authorizes the Legislature to grant exemptions from taxation by general laws. The issue arises in the context of the legislative moratorium on the taxation of unoccupied, newly-constructed, single-family residences.

Consideration of the history and purposes of the two sections and the paramount focus of the Constitutional Convention on the significance of the uniformity clause to the delegates' deliberations on a taxation article leads us to accord primacy to the uniformity provision. We hold that requirement of uniformity to preclude the granting of such an exemption from the general burden of taxation. We therefore do not address the question presented to the Appellate Division of whether the act was invalid as special legislation and thus not an exemption granted by general law.

I

The act, *N.J.S.A.* 54:4–23a, was a response to a severe crisis in the housing industry occasioned by the effect of double-digit inflation and recession in the early 1980s. The act is brief and, as originally enacted in *L.*1982, *c.* 220, stated:

> Any other law to the contrary notwithstanding, no building or other structure newly constructed on any parcel of real property and intended for occupancy and use for residential purposes as a single family dwelling shall be added to the assessment list as real property subject to taxation until a certificate of occupancy or temporary certificate of occupancy has been issued and unless the building or other structure is actually occupied and used for such purposes; provided, however, that such building or structure shall be omitted from taxation for a period not to exceed 24 months. At the termination of the 24 month period or following the granting of a certificate of occupancy or temporary certificate of occupancy and the occupation and use of the building for residential purposes, the building or structure shall be assessed and taxed as of the first day of the month following the date of such use for the proportionate part of said year then remaining.
>
> Nothing in this act shall be construed as applicable to any addition to, or improvement or alteration of, any existing building or structure. Nothing in this act shall be construed to omit from taxation any building or structure or portion of a building or structure subject to taxation prior to the effective date of this act.

In essence, the Attorney General describes the act, which became effective on December 29, 1982, as providing an exemption from the local property tax, *N.J.S.A.* 54:4–1 to :8.16, for a maximum period of two years for newly-constructed property for use as a single-family, residential dwelling, provided such building remains unoccupied and no certificate of occupancy

has been issued. A subsequent amendment clarified that the term "newly constructed" referred only to dwellings whose construction commenced on or after December 29, 1982. *L.* 1983, *c.* 155, § 1.

We shall accept as accurate and complete the recital of the background for the legislation contained in the Attorney General's brief since that recital has not been questioned. The enactment of *N.J.S.A.* 54:4–23a came about as a result of recommendations by the Housing Emergency Action Team (HEAT), a committee of the New Jersey State Assembly. HEAT was formed in March 1981 to seek solutions to a severe housing shortage in the State. The June 1981 report of the committee made various recommendations to address the housing shortage, including the following specific recommendations:

### Reducing the Cost to Build

* Development of Reasonable Model Off-Site Improvement Standards
* Exempt Building Materials from the Sales and Use Tax
* *Exempt Unsold Newly Constructed Homes from Local Property Taxes Until they are Occupied*
* Encourage the Establishment of Maximum Square Footage Zones in Municipalities.

[*HEAT Report* at 12 (emphasis added).]

The report suggested that unsold housing units placed no burden on the municipality while they were unoccupied and thus recommended that unsold, unoccupied residential units should be exempt from taxation during the period of vacancy as a means of reducing the ultimate cost of the home. As originally introduced, the legislation dealt only with detached single-family dwellings. In the course of its passage, it was modified to include all single-family dwellings, not just detached structures. Governor Kean conditionally vetoed the act because of a technical deficiency with respect to the period of the exemption. The Governor's statement recognized the purposes of the legislation and concurred in the conclusion that no unfairness results to municipalities and other taxpayers since little burden is placed upon municipal services by new, unoccupied residential

construction. After modification in accordance with the Governor's recommendations, the bill, in its final form, was enacted as *L*.1982, *c.* 220. On the occasion of signing, the Governor noted that "[b]y exempting the price of the structure, but not the land, from property taxes prior to occupancy, costs to the builder, which are passed along to the buyer are reduced."

In early 1983, the present plaintiffs and others filed an action to declare the act unconstitutional as constituting a special law in violation of *New Jersey Constitution* (1947) art. IV, sec. 7, para. 9 (which prohibits the Legislature from passing special laws) and the taxation art., article VIII, sec. 1, paras. 1 and 2. It is paragraph 2 that specifically requires that exemptions from taxation be granted only by general laws. The Law Division held the statute constituted special legislation in violation of article VIII, sec. 1, para. 2. The court reasoned that the statute granted an exemption from taxation by a special law because it exempted from the property tax only unoccupied single-family dwelling units while failing to include other residential living units, such as mobile homes, cooperatives, and rental-type residential property. (For tax purposes, the value of the property is based upon the value of the land and the improvements. Separate evaluation of the land and improvements is but a step toward that objective. *In re Appeals of Kents 2124 Atlantic Ave., Inc.,* 34 *N.J.* 21, 34 (1961).) It concluded that the classification was irrational in its exclusion from exemption of those categories of property. 197 *N.J.Super.* 89, 104 (1984).

The Attorney General appealed that judgment to the Appellate Division. No cross-appeal was filed by the plaintiffs. On appeal, the Appellate Division reversed the judgment of the Law Division, and held the statute to be general legislation in conformity with art. VIII, sec. 1, para. 2. In the Appellate Division's view, the trial court had erroneously interpreted the term "single-family dwelling" to exclude certain new forms of residential construction. The Appellate Division read the statute to exempt "all buildings and structures which are newly

constructed on any parcel of real property and 'intended for occupancy and use for residential purposes as a single family dwelling,' " arguably including the mobile homes, two-family dwellings, and cooperative housing the Law Division thought were excluded. 204 *N.J.Super.* 323, 329 (1985). The plaintiffs filed a petition for certification with this Court seeking review of that judgment and ultimately reinstatement of the judgment of the trial court. Although the procedural posture of the matter is thus somewhat tentative, we believe it essential to resolve the underlying constitutional issue. Accordingly, we granted the plaintiffs' petition for certification. 102 *N.J.* 384 (1985).

## II

The relevant language of the taxation article of the constitution is as follows:

### ARTICLE VIII

### Taxation and Finance

### Section 1

1. (a) Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.

*     *     *     *

2. Exemption from taxation may be granted only by general laws. Until otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued. Exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.

For ease of reference here we shall refer to paragraph 1(a) as the uniformity clause, although we recognize its two distinct components—that *all* property be taxed by general laws and uniform rules and that defined *real* property be assessed at the

same standard of value and at the general rate of the taxing district for its use.

Since our interpretation of the clauses depends upon the historical context in which the two provisions were adopted, it is necessary to refer to the well-documented contemporary accounts of the proceedings of the 1947 Constitutional Convention as well as later historical analysis.

The predecessor 1844 New Jersey Constitution had been amended in 1875 to address existent problems of preferential taxation. The forces that motivated that first change are clear. The dominant industry of that time, the railroads, exerted considerable influence over the Legislature's taxing power and had obtained for itself virtual exemption from taxation. 1 W. Sackett, *Modern Battles of Trenton* 19–23 (1895). Growing sentiment mobilized by Governor Parker led to a constitutional convention that produced the first limited restraint against preferential tax treatment for one industry. *Cf. Roe v. Kervick*, 42 *N.J.* 191, 207 (1964) (discussing comparable restraints on using public money for private purposes). "[W]hen the State once enters upon the business of subsidies, we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the weaker will be taxed to enhance the profits of the stronger." *Ibid.* (citation omitted). As amended in 1875, the tax clause of the 1844 New Jersey Constitution, art. IV, sec. 7, para. 12, read as follows:

> Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value.

For almost seventy-five years those eighteen words guided New Jersey's Legislature and courts in the development of tax policy. The monograph of Aaron K. Neeld contained in 2 *Proceedings of the State of New Jersey Constitutional Convention of 1947* 1685 (S. Goldmann & H. Crystal ed. 1951) (hereafter referred to as *Proceedings* ), describes that history in detail. We summarize the history based on that description

because we believe it correctly states the assumptions on which the Convention acted.

All taxes are state taxes even though levied for county or municipal purposes. The power of taxation is an essential inherent attribute of sovereignty and is unlimited in scope except as it may be restrained by constitutional inhibition or irrepealable legislative contract. In the absence of specific constitutional inhibition, it was concluded that the Legislature, in the exercise of the sovereign power of taxation, was free to select subjects of taxation. Under the prior constitution, class taxation was valid so long as there was compliance with the classification rule that all reasonably within the class are included, that uniformity prevail throughout the whole class, and that the property be taxed at true value. But it was regularly held that "classification must be of *property*, according to its *characteristics*, or the *use* to which it is put, and not according to the status of the owner, or the mere incidence of location of the property." *Id.* at 1687 (citations omitted).

It was similarly concluded that since the tax clause did not require that *all* property shall be assessed for taxes, the Legislature could classify property for purposes of exemption for taxation subject always, of course, to strict observance of the classification rule. Elimination of a single member of a natural class would invalidate the statute. *Ibid.* The author wrote that "[l]egislative attempts to create special or limited classifications of persons and property have been consistently ruled out under the tax clause." Thus, an attempted special exemption of $500 for exempt firemen and an attempted exemption of improvements on real property within a period of five years have been voided on the ground of improper classifications. *Id.* at 1688 (citing *Tippett v. McGrath*, 70 *N.J.L.* 110 (Sup.Ct.1903), *aff'd*, 71 *N.J.L.* 338 (E. & A. 1904), *Koch v. Essex County Bd. of Taxation*, 97 *N.J.L.* 61 (Sup.Ct. 1922), and *Braunstein v. Jersey City*, 98 *N.J.L.* 478 (E. & A. 1923)). At the same time, the author of the monograph recognized that exemption by classification had been upheld for

purposes of industrial encouragement as well as for the more charitable, religious, and educational uses, *id.* (citing *Schwartz v. Essex County Bd. of Taxation,* 129 *N.J.L.* 129, 133 (Sup.Ct. 1942), *aff'd,* 130 *N.J.L.* 177 (E. & A. 1943), and *Burlington Distilling Co. v. State Bd. of Assessors,* 86 *N.J.L.* 92 (Sup.Ct. 1914), *aff'd,* 87 *N.J.L.* 315 (E. & A. 1915). This classification rule allowed for continued preferential tax treatment for the railroads. 1 W. Sackett, *Modern Battles of Trenton, supra,* at 186.

As this body of tax law evolved, a movement arose for the development of a new and modern constitution for the State of New Jersey. The source of that movement and its development have been described ably in R. Connors, *The Process of Constitutional Revision in New Jersey: 1940–1947* (1970) (hereinafter Connors). The result was a 1941 commission that recommended a new constitution for the State of New Jersey. This later eventuated in the provisions recommended by a Joint Legislative Committee of 1944, which presented a tax clause to the public in this language:

> Property shall be assessed for taxes under general laws, and by uniform rules, according to standards of value as may be pi ⸱⸳?nd by law but not in excess of true value; but exemption from taxation may be granted by law to persons who have been, are, shall be or shall have been in active service in any branch of the military or naval forces of the United States in time of war. [*Proceedings, supra,* vol. 2 at 1694–95 (citation omitted).]

The 1944 Constitution was subjected to political cross-currents that influenced the outcome of its referendum. Various objections were raised, some for ulterior motives, others for genuine concern. Connors, *supra,* at 98. Thus, during the 1944 campaign on the constitutional revision, a controversy arose over whether the "designation of one (the veterans) * * * would exclude all others (religion, education, charity): *expressio unius est exclusio alterius." Proceedings, supra,* vol. 2 at 1695. It appears to be generally conceded that the specific provision for exemption for only one class was one ground for defeat of the 1944 Constitution and that it caused the insertion in the 1947 draft Constitution of a provision for exemptions

presumably to advance those historic exemptions so familiar to the Legislature.

At the same time, a fire storm had developed over a decision of the New Jersey Court of Errors and Appeals that had, in the eyes of its critics, for the first time permitted an unconstitutional discrimination in the taxation of real estate. The controversy arose over a 1941 revision of the Railroad Tax Law by which the proceeds of second-class railroad taxes were devoted to the use of municipalities but the rate of property taxation was fixed at only 3% per $100 of value, notwithstanding the fact the figure was well below the average tax rate for the State. The decision in *Jersey City v. Kelly*, 134 *N.J.L.* 239 (E. & A. 1946), *modifying Jersey City v. State Bd. of Tax Appeals*, 133 *N.J.L.* 202 (Sup.Ct.1945), precipitated the constitutional crisis.

Related litigation explained that the Supreme Court sustained the 1941 act on the basis that it was a permissible means to "ease and make more flexible the burden of taxation of railroad property." *State v. State Bd. of Tax Appeals*, 134 *N.J.L.* 34, 41 (1946), *aff'd o.b.*, 135 *N.J.L.* 482 (E. & A. 1947), and held that classification was "legally favored and separate" when justified on the basis of the "particular or special use to which the railroad property is in fact put." 134 *N.J.L.* at 42. In the words of the attorney for the State League of Municipalities, which presented its views with respect to the decision in *Jersey City* to the Constitutional Convention:

> Thus, for the first time since the adoption of the present tax clause in our Constitution in 1875, our courts have construed that clause to permit the Legislature not only to segregate railroad property for valuation purposes, but also to deliberately assess against it a lower rate than that paid by other property * * *. [*Proceedings, supra*, vol. 5 at 573.]

Undoubtedly, this classification was a factor that led to the rejection of the 1944 Constitution. Connors, *supra*, at 165.

Thus it was in different ways and for different reasons that the people of the State of New Jersey addressed the development of a tax clause in the Constitutional Convention of 1947. The Convention rules assigned to the Committee on Taxation

and Finance the task of fashioning a new clause from various sources, including the property tax clause of the 1875 Constitution.

Those who were concerned about the continued existence of the traditional exemptions from taxation for charitable, religious, and other purposes addressed the Committee about the need of preserving those historical precedents. Some general language dealing with exemptions had to be put in the constitution so that existing and customary exemptions would be continued. This was to meet the *expressio unius* argument that had undermined the 1944 constitutional process. A specific provision for veterans had to be written into the constitution since that was a classification by status, not use. Some proposed that exemptions be granted only by a two-thirds vote of the Legislature, leading some members of the Committee to fear that existing exemptions for the traditional charitable, educational, and religious purposes would cease to exist and would have to be renewed by a new Legislature by a two-thirds vote. That language was rejected. Others addressed the Committee on the need to prevent the use of public funds for religious purposes. For our purposes, we focus on the *expressio unius* argument and on the decision to preserve existing exemptions within the constitutional order.

The debate about uniformity centered inevitably on the preferential position afforded to railroad property and specifically on the possibility that real property taxed for the benefit of municipalities could ever again be subject to discriminant taxation by a Legislature. *See The Meadowlands Regional Redevelopment Agency v. State of New Jersey*, 63 *N.J.* 35, *appeal dismissed*, 414 *U.S.* 991, 38 *L.Ed.*2d 230 (1973) (Conford, J., t/a, concurring in part, dissenting in part). Hence it was that the Committee later focused attention predominantly on the uniformity issue. The municipal interests supporting an equal burden clause were strongly represented by parties from Hudson County (within which the bulk of the railroad land allegedly

unfairly taxed under the pre–1947 laws existed) at the Constitutional Convention.

At the same time, Governor Driscoll perceived that the insistence on taxation at true value presented insuperable obstacles insofar as it applied to all types of property, i.e., business personal property, intangibles, and so forth. And so he worked to bring about a taxation clause that would provide more flexibility for government, foreseeing the possible need for future taxes. The Committee on Taxation was unable to reach agreement on the question of uniformity and the tax controversy was destined to "boil over past the committee stage." Connors, *supra*, at 166.

Out of this struggle came a political compromise, quite unique in the history of such compromise in the candor of its presentation to the public, that would delete the true value requirement from the tax clause but would require that as to real property, then and now the lifeblood of local government, discriminatory burdens be forever barred. To accomplish this specific purpose there were suggested two amendatory sentences:

Property shall be assessed for taxation under general laws and by uniform rules. All *real* property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value and taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district. [*Proceedings, supra*, vol. 1 at 773 (quoting amendment No. 16) (emphasis added).]

The evil that the amendments sought to cure was the still-favorable treatment given to one industry, then the railroad industry. In the words of the representative of the State League of Municipalities,

when it comes to real property, that's an entirely different subject and should not in any way be confused with the franchise tax [imposed on railroads]. The tax burden on that real property should be equal with respect to every type of corporation. Now, there is *every type of corporation in New Jersey today*. Every type of real property owner of every class, with the exception of real property used for railroad purposes, pays the local rate—the utility companies, the gas and electric companies, food processors, milk companies—all of the numerous types of industries which are vitally affected with a public interest

just as much as the operation of the railroads, pay the local rate on their real property. We can't see what possible justification there can be for taking one type of enterprise only, particularly when it is operated for private profit and paying a franchise tax just as any of the others do and giving a $3 rate on real estate to it only. * * * *

It seems to us, really, nothing less than unconscionable that real property devoted, in finality, to the purpose of earning dividends * * * should be subsidized by a half-rate railroad tax rate when other real property is so horribly strangled by the system of taxation and governmental operation which we have in this State. [*Proceedings, supra*, vol. 5 at 641–42.]

Not all dispute about taxation of railroad property was settled by this amendment. Taxation of property specifically "used for railroad purposes" presents special problems, *see New York, Susquehanna and Western Railroad Co. v. Vermeulen*, 44 *N.J.* 491 (1965) (separate assessment and collection procedures for Class II railroad property permissible if burden of taxation is equal), and distinctions as to "main stem" and other property "used for railroad purposes" continue. *New York, Susquehanna & Western Railway Corp. v. Township of Hardyston*, 8 *N.J.Tax* 626 (N.J.Tax Ct.1987).

When the amendment was presented to the delegates at the Constitutional Convention on Tuesday morning, August 26, 1947, Senator Van Alstyne described it thus:

This isn't perfect, but I think it represents the righting of a wrong. I think that we should follow this up with a memorial to the Legislature to take a look at the railroad situation and the tax situation as a whole. This maintains the sovereign right of the State, I repeat, to have control over the situation *with one exception, and that is the right to classify real estate in different categories.*. I repeat again that I do not quite feel we are at that point yet in this State. [*Proceedings, supra*, vol. 1 at 774–75 (emphasis added).]

He went on to say that he felt quite convinced that if this Convention would go along with this amendment (and another), "we can end up having done a job of compromise and reconciliation that will astound the State, and I think will be for the best interests of the State, and that we can pass this Constitution in November." *Id.* at 775.

The amendment's critics understood its significance. Frank J. Murray, vice-chairman of the Convention Taxation and Finance Committee and a delegate from Essex County, cautioned

the members of the Convention that the adoption of such a provision would "very seriously and very substantially limit the power of the Legislature as to taxation," saying that it was "not in the interest of any municipality or in the interest of any individual in this State to place a limitation upon the power of the Legislature in the field of taxation." *Proceedings, supra,* vol. 1 at 779. The delegates passed the amendment No. 16 by a vote of seventy-two to four, *id.* at 785, and the last remaining obstacle to the development of a modern constitution for the people of the State of New Jersey was concluded. Connors, *supra,* at 181.

How then can we reconcile this restraint on the power of the Legislature with the apparent power in the next paragraph of the tax clause to grant exemptions? In the process of the constitutional debate the exemption power was separated out from the uniformity clause and the current exemption language was put in the separate paragraph 2. We think that reconciliation can be achieved by recognition that when the delegates dealt with the exemption power, they considered it as being exercised in the historical mold of the public purpose—then seen primarily as educational, charitable, and religious purposes. The proceedings of the Convention corroborate that such was the general intention of the delegates.

In a colloquy that occurred on July 10, 1947, a committee member reminded the members that

[d]uring the 1944 campaign you will recall the great amount of public debate there was over the question of exemption, and the campaign waged against the Constitution which was then being proposed, on the exemption granted to veterans which would, by implication, prohibit the Legislature from continuing to grant the *time-honored* exemptions to religious, charitable and educational associations. [*Proceedings, supra,* vol. 5 at 655 (emphasis added).]

Another spoke of the constitutional presumption that the "present law providing exemptions is recognized by every lawyer as not being defined under the Constitution, but is being observed by general consent." *Id.* at 614. Another speaker urged the delegates that the exemption provision not be too specific, suggesting that he would "make any reasonable concession, so long as the treatment of an exemption clause

involves matters of policy only, and not matters of *principle.*"
*Id.* at 724 (emphasis added).

These contemporary observations of the delegates coincided
with the language of the statement required by law to be
annexed to the presentation of the constitution to the voters of
the State of New Jersey. In the summary and address to the
people of the State of New Jersey of the tax clause, the report
by the elected delegates stated:

### Existing Tax Exemptions Are Given
### Constitutional Recognition

> The present statutory exemptions of property used for religious, educational,
> charitable and cemetery purposes are guaranteed by the new Constitution. A
> property tax exemption of $500 for veterans also becomes part of the Constitu-
> tion. [*Proceedings, supra,* vol. 2 at 1323.]

Given that the constitutional focus of the delegates on the
taxation of real estate was upon a judicial decision that had
sustained the power of the Legislature, prior to the 1947
Constitutional Convention, to allow for the preferential taxation
of real estate based on the classification of the industry, *Jersey
City v. Kelly, supra,* 134 *N.J.L.* 239, and given that the single
galvanizing event that brought about agreement on a tax
article was a compromise that gave greater flexibility to the
executive and legislative branches in taxing all types of proper-
ty other than real estate, with the apparent purpose of provid-
ing that real property dedicated to municipal tax purposes
should never be taxed at an unequal burden, we cannot con-
clude that the delegates intended that the Legislature could
achieve, by the exemption clause, what could not be done under
the constitutional restraints imposed upon it. For no matter
whether viewed as a classification or as an exemption, it is clear
that the purpose of the challenged provision is to aid an ailing
industry. The legislative statement to the act is quite clear.

> Current law provides that any newly erected structure may be assessed and
> taxed as real property when it is substantially ready for use. This has created
> a financial hardship for builders and developers who cannot consummate sales

of properties upon which they have constructed new dwellings. In order to alleviate much of this financial hardship to an already depressed building industry, this bill would provide that no detached single family dwelling shall be assessed and taxed as real property until a certificate of occupancy has been issued and unless the structure is actually occupied and used for residential purposes. [Assembly Municipal Government Committee Statement, Assembly No. 855, *L.*1982, *c.* 220.]

And while it can be argued that it is not the industry but the residential purchaser who gains the benefit, the same could be said of railroad passengers.

## III

Subsequent judicial and legislative interpretation of the tax article supports this conclusion. In *Switz v. Kingsley*, 37 *N.J.* 566 (1962), this Court held unconstitutional a section of the Farmland Act that allowed for preferential property tax treatment for qualifying farmlands by assessing farmland at its value for agriculture rather than its fair market value. It based this holding on its intepretation that

with respect to real property made taxable by statute for local purposes, *Art.* VIII, § I, *par.* 1 * * * explicitly forbids preferential treatment. It expressly requires that all real property assessed and taxed locally or by the State for allotment and payment to taxing districts "shall be assessed according to the *same* standard of value" and "shall be taxed *at the general tax rate* of the taxing district in which the property is situated, for the use of such taxing district." [37 *N.J.* at 584.]

Subsequently, in the 1963 general election, New Jersey voters amended art. VIII, § 1 by a margin of over two to one. *See* Note, "Preserving New Jersey's Forestland Through the Farmland Assessment Act," 17 *Rutgers L.J.* 155 (1985). The new paragraph 1(b) mandated that the State accord farmland special property tax treatment, thereby rendering *Switz* moot.

In *General Electric Co. v. City of Passaic*, 28 *N.J.* 499 (1958), *appeal dismissed*, 359 *U.S.* 1006, 3 *L.Ed.*2d 987 (1959), following adoption of the 1947 Constitution, Justice Jacobs explained that the exemption from business property taxes of

personal property in warehouses could continue to be valid. Obviously, real property was not included within the contemplation of his decision. In *The Meadowlands Regional Redevelopment Agency v. State of New Jersey, supra,* 63 *N.J.* 35, a challenge under art. VIII, § 1 to the constitutionality of the Hackensack Meadowlands redevelopment plan, the issue, and the point on which Judge Conford dissented, involved the use by one municipality of tax proceeds raised by another municipality. The dispute did not involve unequal tax burdens on real property. 63 *N.J.* at 62 (Conford, J., concurring in part and dissenting in part). Nor is *Township of Princeton v. Bardin,* 147 *N.J.Super.* 557 (App.Div.), *certif. den.,* 74 *N.J.* 281 (1977), inconsistent in recognizing a public purpose of preservation of open space to warrant exercise of the exemption power.

Finally, we note that repeated amendments to the Constitution have been required to grant exemption from taxation for real property. Provisions for senior citizens, disabled persons, and surviving spouses of such persons have been variously presented to the public for authorization, as well as a homestead rebate and special provisions for areas in need of rehabilitation. Of course, with the exception, perhaps, of the homestead rebate, these are exemptions accorded by status, not use; however they are expressive of the limited power of exemption.

The Attorney General has made reference to exemptions for property improvements, such as fallout shelters, pollution control devices, automatic fire systems, and solar heating devices, for the proposition that exemption power extends to this purpose. We need not debate here the difference between such exemptions related to national security, environmental health or public safety, and exemptions stated to be for the purpose of aiding a depressed industry. We note, however, on their face these improvements plainly appear to advance purposes generally beneficial to society as a whole unrelated to a particular industry or the status of the taxpayer. Recognition of such

exceptions would appear to be much more in accord with the history and tradition that surround this power of exemption.

Given the specific history of the constitutional debate on the legislative power to tax real property, and the consistent judicial interpretation of the tax clause of the Constitution since 1947, although every indulgence should ordinarily be accorded to the Legislature in the development of tax policy, we believe that the specific restraint upon taxing power set forth in art. VIII, sec. 1, para. 1 requires this decision.

We have not failed to recognize that a severe financial crisis in the availability of housing faced the people of the State of New Jersey at the time this legislation was enacted. Fortunately these economic conditions are not present today and we have been advised of no significant disruption of financial planning by this decision. No party has sought any form of monetary relief. Should the conditions arise again, we are confident that the Legislature is not without power to deal with a specific area of the economy that needs its attention. Its general powers would undoubtedly enable it to fashion an appropriate program for industrial stimulation without offending this specific provision of the tax clause of the Constitution.

For the reasons stated, the judgment of the Appellate Division is reversed.

CLIFFORD, J., concurring.

Because the Court's opinion leaves me uncertain about the basis on which *N.J.S.A.* 54:4-23a is declared to be unconstitutional, I put a little distance between myself and the majority by stating separately my reasons for joining in the result.

Let me explain why I am unsure of the Court's holding. If the point is that the uniformity rule for taxation of real property, which "forever bar[s]" discriminatory burdens, *ante* at 433, cannot be avoided by resort to the exemption clause, then I do not quite grasp the significance of the Court's reference, *ante*

at 438, to other property-improvement exemption statutes. That reference might leave one with the impression that discriminatory classification and exemption of real property is unconstitutional only when the purpose of the offending legislation is to benefit a particular industry. That impression is fortified by the discussion surrounding the two "amendatory sentences," *ante* at 433–434, as well as the opinion's flat-out statement that "[r]ecognition of such [statutory] exemptions [for property improvements such as fallout shelters, pollution control devices, automatic fire systems, and solar hearing devices] appears to be in accord with the history and tradition that surround this power of exemption." *Ante* at 439. If that is the holding, I should think that the Court would do well to say so.

That would not, however, be my holding. The "history and tradition that surround this power of exemption" are well and forcefully stated by the Court. *Ante* at 438. They require that "as to real property, then and now the lifeblood of government, discriminatory burdens be forever barred." *Ante* at 433. Coupled with the characterization of the exemption clause as being limited to its "historical mold," *ante* at 435, and with the observation that "real property dedicated to municipal tax purposes should *never* be taxed at an unequal burden," *ante* at 436–437 (emphasis added), the opinion can be read to say that the exemption clause can never defeat the uniformity requirement for taxation of real property. That is my view of the correct holding. I would therefore not encourage those who must wrestle with real-property tax law to believe that the Court has left for another day the possibility that a "public purpose" classification for partial exemption from real property taxation can be achieved without a constitutional amendment.

CLIFFORD, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.