HOPKINS, J.T.C.
These are consolidated appeals from the judgments of the Bergen County Board of Taxation affirming the 1986 local property tax assessments of two condominium units located in Ridgefield Park. At issue is whether the units, which were purchased pursuant to an “affordable housing” program, implemented by the Housing Authority of Bergen County (HABC), with restrictions upon the resale of said units, should be valued, *105 for local property tax purposes, by taking those resale restrictions into consideration.
The facts have been stipulated.
Ridgefield Park is not, nor has it been at any relevant time, a party to any “Mount Laurel” exclusionary zoning litigation. There are no judicial or administrative orders requiring construction of “lower income” housing units within the municipality. The pertinent resale restrictions contained in the master deed and by-laws of the condominium association (master deed) were not the result of any legislation, laws or regulations of the State of New Jersey on affordable housing.
Ridgefield Park is a community consisting of approximately 12,500 residents and has one of the lowest per capita incomes of the 70 municipalities in Bergen County. It has the tenth highest tax rate in Bergen County. A substantial amount of Ridgefield Park property is tax-exempt due to the location of State highways, i.e., the New Jersey Turnpike, Routes 95, 80 and 46, as well as certain property owned by the Bergen County Park Commission.
The Housing Development Corporation of Bergen County (HDC) is a nonprofit corporation of the State of New Jersey. It was formed for the purpose of acquiring land in Bergen County and raising money for the construction of affordable housing. Applicable federal regulations restricted the HABC, a body politic of the State of New Jersey, organized under N.J.S.A. 55:14A-1 et seq., in raising construction moneys through the issuance of bonds and the acceptance of moneys from a community development program. As such, a separate nonprofit corporation, i.e., HDC, was formed. It has five trustees, two of whom are also commissioners of the HABC. The three remaining trustees are appointed by the commissioners of HABC.
The subject condominium units were acquired by HDC in 1980 at fair market value purchase prices from unrelated third parties.
In implementing its affordable housing program, HDC has certain eligibility criteria established by the HABC. The house *106 hold must consist of three or more members, with the provision that consideration will be given to a single parent with one child. The total family income shall not exceed 80% of the county median income for a family of four, as published by the Department of Housing and Urban Development (HUD). In 1987[1] that income was $30,400 for a family of four, and for five and six-person households, the limits were $32,300 and $34,200, respectively.
The preference and selection criteria gave first priority to residents of Mahwah, a second preference to residents of other communities in Bergen County and a third preference to householders living and working in the State of New Jersey. The preference criteria included income and assets, family size and composition and substandard living conditions.
Included in the guidelines and preference criteria, was the provision that large assets from savings or other sources could be used to purchase the unit without penalty. Applicants with less than $60,000 in such assets would have a preference over those with assets in excess of $60,000. Further, in addition to all other criteria, the applicants must demonstrate their ability to obtain permanent mortgage financing based upon standard underwriting procedures of the mortgagee.
Once having qualified under the above criteria, a purchaser was subject to resale restrictions contained in the master deed.
HDC, as sponsor for the condominium association, transferred the properties to the association subject to standard condominium association provisions as well as the provisions which are particularly applicable to the issue here involved.
The association was obliged to fix common expense assessments in an amount sufficient to maintain the exterior of the buildings and to maintain and operate other common elements. Insurance premiums were to be paid from such common assessments. Each assessment is a continuing lien on the unit *107 against which it was made and is also the personal obligation of the owner of such unit. However, any such common expense lien was subordinate to the lien of any first mortgagee, provided, however, that such subordination should apply only to the sale or transfer of any such unit, pursuant to a decree, or foreclosure, or any proceeding in lieu of foreclosure. Such sale or transfer would not relieve the owner from personal liability. Common expense assessments were to be used exclusively for promoting the health, safety, pleasure and welfare of the members of the association including, among various other items, payment of all taxes. All unit owners were required to perform and be responsible for the maintenance, repairs and replacements within their own units. Failure to perform such work, could result in the association performing the work and charging reasonable expenses to the unit owner.
The master deed also provided that the unit owner would reside in the unit for a period of three years, absent a change of circumstance. In the event of such change of circumstance, and in any future sale beyond the three-year period, HDC had an exclusive first option to purchase the unit at a price which would be computed by utilizing the unit owner’s purchase price, adjusted for any change in the consumer price index. In the event HDC declined to exercise said option, the unit owner could then sell the unit at the designated sales price to a family which met the eligibility criteria promulgated by HABC. The deed also states that if any of its provisions violate the rule against perpetuities, then such provision shall be deemed to remain in effect until the last survivor of the now living descendants of a former senator of the State of New York, plus twenty-one years thereafter.
The restrictions on sale and purchase price would not apply to a mortgagee who acquired title through a sheriff’s sale or otherwise, provided, however, that such mortgagee must notify the HDC, which would then have the exclusive first option to secure a purchaser during the next 80-day period. They further provide that each unit owner would have the right to mortgage or encumber his unit, provided that such mortgage or *108 encumbrance was made to a bank, mortgage banker, trust company, insurance company, savings and loan association, pension fund or other institutional lender, or as a purchase money mortgage made to the sponsor or to the immediate predecessor in title to a unit. Also, all property taxes imposed by any taxing authority were to be separately assessed against and collected on each unit as a single parcel, as provided in the New Jersey Condominium Act.
Once a family qualifies for ownership of the subject unit, its income, assets or other qualifying characteristics are no longer relevant to continued possession or ownership of the units.
Ridgefield Park cooperated with HDC in the approval and construction of the subject units. However, there was no agreement between HDC and Ridgefield Park regarding the valuation or taxation of the units.
On March 9, 1983, Wayne and Doreen Prowitz purchased a new condominium unit, known as Block 29, Lot 15, from HDC for a total consideration of $42,500. They had qualified under the affordable housing program and the units were purchased subject to the restrictions previously detailed. As of October 1, 1985, the purchase price for which they were required to resell the property to HDC, as a result of the consumer-price-indexed adjustment, was $46,897. The 1986 assessment placed on the unit, based upon the October 1, 1985 valuation date, was $86,300. The parties agree that, absent the restrictions requiring resale of the property to HDC, the property had a value which would support the 1986 assessment of $86,300. On August 24, 1981, Dennis M. and Kathleen Dunleavy, having qualified as being eligible to purchase affordable housing as previously detailed, purchased a new condominium unit from HDC for a total consideration of $40,000. As of October 1, 1985, the assessment date for 1986, pursuant to the deed restrictions, they could only sell the property to HDC at a price of $46,864. The 1986 assessment on the subject unit, as of October 1, 1985, was $84,600. The parties agree that such assessment is appropriate if the restrictions on resale to HDC *109 had no impact upon value for local property tax assessment purposes.
The parties agree that the purpose of the restrictions contained in the master deed was to insure that the units would be retained as affordable housing units within the county. Accordingly, the owners thereof, who might wish to move, could not dispose of the units to other parties at a substantial profit, especially when the owners had been afforded an opportunity to purchase these units at a cost less than other comparable housing.
While the parties have stipulated that the taxpayers have fee simple ownership of their units, such stipulation cannot be accepted as a legal conclusion that they own the properties in fee simple as normally understood. A fee simple estate is generally recognized as one in which the owner is entitled to the entire property, with unconditional power of disposition during his life. Here, the taxpayers did not enjoy the right to freely transfer the property. That right was restricted by the grantor. It should be noted, however, that the taxpayers had complete freedom to use the property to secure a mortgage loan and that the mortgagee’s rights to sell, on acquisition by foreclosure or other means, was only restricted to giving HDC a right of first refusal. The legality of the restrictions is not in issue.
Taxpayers contend that the restriction on resale must be considered in determining the assessment value and, further, that the reduced assessment value will accord with the public policy of affordable housing as enunciated by the Fair Housing Act, N.J.S.A. 52:27D-301 et seq.
Article VIII, § 1, par. 1, of the New Jersey Constitution of 1947, provides, in part, that all real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted by the constitution, and that such property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of *110 such taxing district. The constitutional mandate to assess all real property according to the same standard of value has been statutorily translated into the assessor’s duty to “determine the full and fair value of each parcel of real property situated in the taxing district at such price as, in his judgment, it will sell for at a fair and bona fide sale by contract” on the assessment date. N.J.S.A. 54:4-23. In this context, “full and fair value” is the equivalent of true value, also referred to as market value. Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952); Willingboro Chrysler-Plymouth v. Edgewater Park Tp., 6 N.J.Tax 168, 176 (1983).
 It is a basic principle of local property tax assessment in New Jersey that the independent holding of separate legal interests in taxable property does not affect the method of valuing and assessing the total property. “The law requires an assessment of the value, not of the purported owner’s title, but of the land; the assessed value of the land represents the value of all interests in the land.” Trustees of Llewellyn Park v. West Orange Tp., 224 N.J.Super. 342, 540 A.2d 868 (App.Div.1988); Stack v. Hoboken, 45 N.J.Super. 294, 300, 132 A.2d 314 (App.Div.1957); Lidell v. Mimosa Lakes Ass’n., 6 N.J.Tax 417, 424 (1984). Thus, landlord and tenant interests, life tenant and remainder interests, co-tenant interests, mortgagor/mortgagee interests and grantor/grantee interests (where less than a full fee is conveyed) are not separately assessed; instead, the full value of the fee is assessed as though there were no separate interests. See Lidell, supra at 425. Also, the fact that the owner’s title has a cloud on it is not a proper basis for reducing the land assessment value. Stack v. Hoboken, supra, 45 N.J.Super. at 300, 132 A.2d 314.
There are exceptions to the above general rule of valuation when the assessed property is subject to an easement. Those exceptions occur when the easement is in favor of the public generally, Englewood Cliffs v. Allison Estate, 69 N.J. Super. 514, 174 A.2d 631 (App.Div.1961); in favor of the public when a perpetual restrictive environmental easement is given to *111 a nonprofit organization whose goal is the encouragement of open space, Ridgewood v. Bolger, 104 N.J. 337, 517 A.2d 135 (1986); and lastly, when the easement value is reflected in the value of a dominant estate, then a corresponding decreased value is reflected in the servient estate, Tower West Apt. Ass’n. v. West New York, 2 N.J.Tax 565, 570 (Tax Ct.1981).
The subject cases do not involve easements. Rather, they are, effectively, options to repurchase at a designated purchase price or, in the absence to so exercise that option, to require the seller to sell to a specified class at that price. These are rights which the grantor, HDC, retained in conveying title to the taxpayers. As such, they are restrictions upon title or the right to exercise all incidents of ownership in the property. The incidents of full ownership which the taxpayers do not have were retained by HDC. Between the taxpayers and HDC there exists full and complete title to the property. It is that total property interest which is subject to taxation by the taxing district.
In considering taxpayer’s argument that a reduced assessment value is in accord with the public policy of affordable housing, it is recognized that the housing was made available to the taxpayers through the efforts of HABC and HDC, in good faith compliance with the philosophy behind the Fair Housing Act as detailed in the provisions of N.J.S.A. 52:27D-301 et seq. In that respect, N.J.S.A. 52:27D-302 provides, in pertinent part, as follows:
The Legislature finds that:
a. The New Jersey Supreme Court, through its rulings in South Burlington County NAACP v. Mount Laurel, 67 N.J. 151 [336 A.2d 713] (1975) and South Burlington County NAACP v. Mount Laurel, 92 N.J. 158 [456 A.2d 390] (1983), has determined that every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region’s present and prospective needs for housing for low and moderate income families.
c. The interest of all citizens, including low and moderate income families in need of affordable housing, would be best served by a comprehensive planning and implementation response to this constitutional obligation.
*112 d. There are a number of essential ingredients to a comprehensive planning and implementation response, including the establishment of reasonable fair share housing guidelines and standards, the initial determination of fair share by officials at the municipal level and the preparation of a municipal housing element, State review of the local fair share study and housing element and continuous State funding for low and moderate income housing to replace the federal housing subsidy programs which have been almost completely eliminated.
Further, N.J.S.A. 52:27D-311, which is also part of the Fair Housing Act, provides:
Housing element; techniques for providing low and moderate income housing; phasing schedule; regional contribution agreement; expenditure of municipal revenues unnecessary
a. In adopting its housing element, the municipality may provide for its fair share of low and moderate income housing by means of any technique or combination of techniques which provide a realistic opportunity for the provision of the fair share. The housing element shall contain an analysis demonstrating that it will provide such a realistic opportunity, and the municipality shall establish that its land use and other relevant ordinances have been revised to incorporate the provisions for low and moderate income housing. In preparing the housing element, the municipality shall consider the following techniques for providing low and moderate income housing within the municipality, as well as such other techniques as may be published by the council or proposed by the municipality:
(1) Rezoning for densities necessary to assure the economic viability of any inclusionary developments, either through mandatory set-asides or density bonuses, as may be necessary to meet all or part of the municipality’s fair share;
(2) Determination of the total residential zoning necessary to assure that the municipality’s fair share is achieved;
(3) Determination of measures that the municipality will take to assure that low and moderate income units remain affordable to low and moderate income households for a appropriate period of not less than six years;
(4) A plan for infrastructure expansion and rehabilitation if necessary to assure the achievement of the municipality for purposes of providing low and moderate income housing;
(5) Donation or use of municipally owned land or land condemned by the municipality for purposes of providing low and moderate income housing;
(6) Tax abatements for purposes of providing low and moderate income housing;
(7) Utilization of funds obtained from any State or federal subsidy toward the construction of low and moderate income housing; and
(8) Utilization of municipally generated funds toward the construction of low and moderate income housing.
d. Nothing in this act shall require a municipality to raise or expend municipal revenues in order to provide low and moderate income housing.
*113 The above legislative findings, as well as the recommended techniques for providing low and moderate income housing, are consistent with the provisions contained in the restricted title possessed by the taxpayers. The statutory provisions, as well as the restrictions on title, do not, as properly emphasized by defendant, contain any indication that there was to be a continuing subsidy, through lower taxation, of the occupants of said housing. Rather, the deeds’ provisions indicate that all taxes will be paid. Further, the statutorily recommended techniques for providing such housing mention taxation only to the extent of utilizing tax abatements. Such tax abatements would be those authorized by Article VIII, § 3, par. 1 of the Constitution, which restricts such favored treatment to a limited period of time during which the profits of, and dividends payable by, any private corporation enjoying such tax exemption shall be limited by law. Situations would be those permitted under N.J.S.A. 40:55C-40 et seq. (Urban Renewal Corporation and Association Law), or under N.J.S.A. 54:4-3.95 et seq. (act to provide for exemptions and abatements on commercial and industrial structures in areas in need of rehabilitation). Neither of those laws can be construed to permit favored tax treatment of an owner/occupant of housing acquired through municipal or county implementation of the Fair Housing Act.
To construe the Fair Housing Act as a basis for a policy of favored tax treatment to those who acquired such housing would result in the creation of a favored class of taxpayers. The criteria for purchasing such housing are such that there could very well be other proximate homeowners in similar economic circumstances, who had acquired their housing at an earlier time, at a less inflated price, or through inheritance or some other fortuitous circumstance, who would be taxed on full value. Further, the subject taxpayers’ economic circumstances, whereby they initially qualified, need not continue in order for them to continue to utilize the housing.
The case of New Jersey League of Municipalities v. Kimmelman, 105 N.J. 422, 522 A.2d 430 (1987), reemphasized the need for strict compliance with the constitutionally required *114 taxation of real property under general laws and by uniform rules according to the same standard of value. N.J. Const. (1947), Art. VIII, § 1. In striking down an exemption applicable to .newly built housing until such housing was occupied, the Court reemphasized the need to adhere to the uniformity clause of the Constitution. In discussing the history of that clause, it pointed out the need for constitutional amendments in order to grant such exemptions to senior citizens, disabled persons and the surviving spouses of such persons, as well as homestead rebates and special provisions for areas in need of rehabilitation. 105 N.J. at 438, 522 A 2d 430. That opinion also discussed the need for a constitutional amendment to grant favorable tax treatment to farmland. Id. at 437, 522 A 2d 430. All of those exemptions were based on a definite public policy as enunciated in this State. Yet, they required an amendment to the Constitution in order to be viable. Here, the public policy argument must fail for the reason that there has been no showing that there was ever a statutory enactment authorizing such treatment. As such, there is no constitutional question in this case.
The parties having agreed that the assessments are appropriate if the properties are to be assessed without taking into consideration the restrictions on alienability contained in the respective deeds, such assessments are sustained.

 While the tax year involved is 1986, the record discloses only 1987 income requirements.