KUSKIN, J.T.C.
Plaintiff has appealed the tax year 2001 property tax assessments on the following tax lots, all located in Block 1 as designated on defendant’s Tax Map:[1]
*279 Lot Number Assessment
1380 FW01 $ 9,959,100
1380 A2W01 619.300
1380 A3W01 839,100
1380 A4W01 455,400
1380 A5W01 308,500
1380 A6W01 263,700
1380 A7W01 94,500
1380 A1AW01 381.300
1380 A1BW01 381,800
1380 A4BW01 455,400.
The assessments on all lots related to land only. Lot 1380 FW01, which contains 98.41 acres, is hereinafter referred to as Lot F. Lots 1380A2W01 through A7W01, and Lots 1380A1AW01, A1BW01 and A4BW01, which in the aggregate contain 28.82 acres with a total assessment of $3,799,000, are hereinafter referred to collectively as Lot A. Lots A and F are referred to together as the “subject land.”
Plaintiff also appealed the assessments on Lots A and F for tax years 1999 and 2000. In a bench opinion of July 19, 2002, I granted defendant’s summary judgment motion and dismissed those appeals. I dismissed the 1999 appeal on the ground that no timely appeal was filed either to the Tax Court or to the county board of taxation, and dismissed the 2000 appeal on the ground that no timely appeal was filed to the Tax Court from the judgments of the county board of taxation. I further held that, under Hovbilt, Inc. v. Howell Tp., 138 N.J. 598, 651 A.2d 77 (1994), plaintiff was not entitled to relief for either 1999 or 2000 under the correction of errors statute, N..J.S.A. 54:51A-7, because determination of the proper assessments on the subject land required the exercise of the tax assessor’s judgment as to value.
Plaintiff has challenged the 2001 assessments on three grounds: 1) the assessments violated the financial agreement (described below) between plaintiff and defendant by including certain improvements to the subject land; 2) the assessments violated provisions of the financial agreement limiting the assessments to their aggregate amount for tax year 1998, that is, $1,601,500; and *280 3) the assessments were excessive. At the request of the parties, I bifurcated this matter and conducted a trial as to issues 1 and 2, with issue 3 (value) to be tried at a later date if necessary. This opinion addresses only issues 1 and 2.
I.
Facts.
In connection with the proposed development of the subject land, plaintiffs attorneys participated in the drafting of the Large Site Landfill Reclamation and Improvement Law, N.J.S.A. 40A:12A-50 to — 63 (the “Landfill Law”) and lobbied for its enactment. The Law (enacted in 1996) permits a municipality to establish a landfill reclamation improvement district and apply to the New Jersey Economic Development Authority (EDA) for the issuance of bonds to provide funds for development or redevelopment within the district. N.J.S.A. 40A:12A-57a. The Landfill Law authorizes tax exemptions and payments in lieu of taxes within the district in accordance with the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -20 (the “Long Term Law”), with assignment to the EDA of payments in lieu of taxes in order to pay or secure the bonds. N.J.S.A. 40A:12A-56a and — 57c.
In order to offset the loss of revenues resulting from assignment of payments in lieu of taxes, the Landfill Law permits a municipality to impose a franchise assessment within an urban enterprise zone located in a landfill reclamation improvement district. N.J.S.A. 40A:12A-53. The franchise assessment “may not exceed three percent of gross receipts” from, among other items, the sale price of tangible personal property sold by a business within the district, and rent from commercial property within the district. N.J.S.A 40A:12A-51 and —53a. The proceeds of the franchise assessment must be devoted to “municipal purposes.” N.J.S.A 40A:12A-53h. If, however, any proceeds of the franchise assessment are not used for purposes of the district, ten percent of the unused portion must be paid “to the county for use in economic development.” N.J.S.A 40A:12A-54.
*281 In June 2, 1997, defendant adopted two ordinances pursuant to the Landfill Law. One ordinance established a landfill reclamation improvement district which included the subject land. Defendant had previously declared the subject land a blighted area under the Blighted Area Act, N.J.S.A. 40:55-21.1 to — 21.9 (now replaced by N.J.S.A. 40A:12A-1 to — 49). The second ordinance imposed a franchise assessment of “three percent (3%) on the amount of the sale price of all tangible personal property sold by each business within the [landfill reclamation improvement] District.” Defendant then designated Elizabeth MetroMall, LLC, (“Elizabeth Met-romall”) an entity related to plaintiff, as redeveloper of the subject land. On December 1, 1997, Elizabeth MetroMall, plaintiff, and defendant entered into a redevelopment agreement which contemplated that plaintiff would acquire the subject land and lease it to Elizabeth MetroMall which would function as the redeveloper. The acquisition occurred thereafter, and the lease document was signed.
In January 1998, pursuant to the Long Term Law, defendant adopted an ordinance (the “Exemption Ordinance”) authorizing a property tax exemption for improvements on the subject land, and authorizing defendant to enter into a financial agreement with plaintiff. The Exemption Ordinance provided for a payment in lieu of taxes (PILOT) in the initial annual amount of $8,925,000, increasing by 10% during each year of the term of the tax exemption. The Exemption Ordinance also set forth defendant’s agreement to pledge the PILOT to the trustee of the EDA bonds issued in order to fund the reclamation of the landfill located on the subject land.
On July 1, 1998, plaintiff and defendant entered into a financial agreement (the “Financial Agreement”), having a term of thirty years from the date of completion of construction of the contemplated buildings and improvements on the subject land. The Financial Agreement includes the following defined items:
“Entity” — plaintiff;
“Improvements” — “any building, structure or fixture permanently affixed to the Property;”
“Land Taxes” — taxes assessed on the subject land;
*282 “Project” — the “Property and Improvements” thereon constituting a “project as defined in N.J.S.A 40A:20-3(e);” and
“Property” — the subject land.
The Agreement contemplates that the Project will consist of a retail shopping mall and other commercial uses, containing in the aggregate approximately 1,800,000 of gross buildable area, together with supporting roadways and infrastructure.
The Financial Agreement contains the following specific provisions relating to property taxes:
Section 4.3. Land Taxes.
Land Taxes shall be separately assessed for each parcel comprising the Property, and shall be assessed only on the land portion of the Property, without regard to any Improvements or increase in value to the land because of the Improvements.
Section 16.11. No Additional Taxes.
Except as required by law so long as any PILOT Bonds remain outstanding, the City shall not impose any other payments in lieu of taxes or special assessments on the Property or the Improvements on the Property, and shall not impose any ad valorem property taxes on any improvements on the Property, without the prior written consent of the holders of at least 66 — %% in aggregate principal amount and accreted value of outstanding PILOT Bonds.
The City will only impose ad valorem property taxes on the unimproved Property in accordance with the laws of the State of New Jersey applied to all real property in the City on a uniform basis.
Early drafts of the Financial Agreement contemplated that, in accordance with the Long Term Law, land taxes would be credited against the PILOT, N.J.S.A 40A:20-12b, so that the developer’s obligation for the PILOT and land taxes would, in effect, equal the PILOT. However, the underwriter for the EDA bonds advised the parties that the bonds could be sold only if the entire PILOT, not reduced by the land tax credit, was pledged to support the bonds. Accordingly, defendant agreed to pledge the entire PILOT to the trustee and receive only taxes on land plus the 3% franchise assessment. The revisions to the Financial Agreement to reflect these agreements included Sections 4.3 and 16.11 quoted above. The latter section was inserted after Section 4.3 had already been included.
As noted above, plaintiff claims that the assessments on the subject land improperly included improvements in violation of the provisions of the Financial Agreement. Plaintiff presented no *283 proofs at trial in support of this claim, and, accordingly, I deny any relief to plaintiff on this basis.
Plaintiffs second claim for relief is that the assessments in issue violate the intention and understanding of the parties, as incorporated in the Financial Agreement, that, during the term of the Agreement, the subject land would be assessed as unimproved and unimprovable and that the assessment would not increase significantly over the $1,601,500 assessment in place as of the date of the Agreement. Consequently, plaintiff contends that the 2001 property tax assessment on the subject land should be reduced from an aggregate of $13,758,100 to an aggregate of $1,601,500. This reduced assessment would ignore the reclamation of the landfill, approvals for construction of the Jersey Gardens shopping mall and other improvements, and a variety of off-site improvements providing access, drainage, and other facilities for the subject land.
Defendant responds to plaintiffs claims as follows: 1) the Financial Agreement does not contain any agreement or understanding freezing or otherwise limiting the tax assessment, nor did defendant intend to freeze or limit the assessment; 2) even if the Financial Agreement incorporates such a freeze or limitation, the Exemption Ordinance did not permit any limitation and, therefore, the limitation is ultra vires and invalid; 3) no such freeze or limitation is authorized by the Long Term Law, and, therefore, even if authorized by ordinance and agreed to, the freeze or limitation would be invalid because it violates the statutory requirements; and 4) even if the freeze or limitation is permitted by the Long Term Law, the applicable provisions of the Long Term Law would violate the provisions of the New Jersey Constitution relating to uniformity of assessment, N.J. Const., art. VIII, § 1, ¶ 1, and imposing a five-year limit on tax abatements on land, N.J. Const, art. VIII, § 1, ¶ 6.
II.
The Agreement Between the Parties.
Sections 4.3 and 16.11 of the Financial Agreement are the only provisions of the document that relate specifically to the property *284 tax assessment on the subject land. Plaintiff asserts that the agreement to limit the assessment on the subject land is contained in Section 4.3 which provides that the subject land shall be assessed “without regard to any Improvements or increase in value to the land because of the Improvements,” and in Section 16.11, which provides that defendant “will only impose ad valorem property taxes on the unimproved Property in accordance with the laws of the State of New Jersey applied to all real property in the City on a uniform basis.” Plaintiff presented the testimony of its vice-president and attorney to describe the negotiations relating to the Financial Agreement, and to explain the intended meaning of Sections 4.3 and 16.11. Neither plaintiff nor defendant presented any witness who participated in the contract negotiations on behalf of defendant.
The vice-president of plaintiff who signed (but did not read in their entirety) the Financial Agreement and other documents, testified to his understanding, not based on specific language in the Financial Agreement or in another document, that the assessment on the subject land would not be substantially increased during the term of the Financial Agreement. This understanding is reflected in a letter he wrote to the Union County Assistant County Manager on September 27, 1999 protesting the increased assessment on the subject land. Copies of the letter were sent to defendant’s mayor and attorney. The letter does not refer to specific provisions of the Financial Agreement or other documents, but contains the following paragraph:
At the time the PILOT payments were being negotiated, it was the intention of all parties, most certainly NJMM [ (New Jersey MetroMall) ], that the assessed value of the land would be frozen during the pendency of the PILOT payments. Minimizing land taxes was the concept accepted by the parties as [sic], due to the requirement for a predetermined bond payment in the amount of $8,925,000 per year. It was not possible for the City to issue a credit per land taxes to NJMM, as would customarily be the case. Clearly, absent the belief that land taxes would be frozen, NJMM would never have agreed to the PILOT payment arrangement. Given this fact, NJMM respectively requests that the total valuation of the land be reduced to the 1998 figure of $1,601,500 for both parcels (with a corresponding total tax liability of $84,910.95) so as to compensate NJMM for the inflated PILOT payments. This reduction in the land tax would be in keeping with both the spirit and the intent of the original PILOT Ordinance and I would ask, therefore, that you give this matter serious consideration.
*285 The attorney representing plaintiff in the negotiation of the Financial Agreement and related documents testified that representatives of plaintiff and the attorney for defendant understood that land taxes were not to increase substantially during the term of the Financial Agreement. When asked why the Financial Agreement did not expressly set forth that understanding, he testified that local counsel for plaintiff expressed concern about the legality of a statement expressly limiting the land assessment. The attorney testified that the language in Sections 4.8 and 16.11 ■was intended to memorialize the agreement as to an assessment freeze without expressly stating that agreement. He acknowledged that the language was an effort to “finesse” the issue of the freeze on the subject land assessment.
The language of the Financial Agreement does not reflect the intentions and agreement to which plaintiffs vice-president and attorney testified. Section 4.3 simply provides that the subject land is to be assessed without considering the “Improvements,” and that the assessment will not be increased as a result of the Improvements. The term “Improvements” is defined in the Financial Agreement as “any building, structure or fixture permanently affixed to the Property.” Consequently, Section 4.3 does not preclude increases relating to market conditions, or resulting from governmental approvals, or off-site improvements. Similarly, Section 16.11 precludes assessments on the Improvements and requires that property taxes be imposed only on the “unimproved property in accordance with the laws of the State of New Jersey applied to all real property in the City on a uniform basis.” This Section was added at the conclusion of the negotiations of the Financial Agreement, and, therefore, reflects the final understanding and agreement of the parties. Under the quoted language, the assessment on the property could be increased for any factors which would warrant increases in assessments on other unimproved property in the City of Elizabeth. Thus, neither Section 4.3 nor Section 16.11 requires that the assessment on the subject land be frozen at or close to $1,601,500.
Other provisions of the Financial Agreement and provisions in related documents also indicate that the parties did not reach a *286 meeting of the minds to freeze the assessment on the subject land. Section 2.1 of the Financial Agreement sets forth the tax exemption for improvements on the Property, and Section 3.1 provides as follows as to the expiration of the exemption: “At the expiration of the term hereof the tax exemption for the Project shall expire and the Improvements on the Property shall thereafter be assessed and taxed according to the general law, applicable to other non-exempt property in the City.” This Section neither expressly nor impliedly provides that the expiration of the term of the Financial Agreement will require a change in land assessment to that required by “general law.” This suggests an understanding by the parties that the basis for tax assessment of land during the term of the Financial Agreement was to be the same basis as would be applicable without regard to the Agreement.
The prospectuses prepared in connection with the EDA bonds to be issued to finance the landfill reclamation work at the subject land are part of the overall transaction which included the Financial Agreement. These documents are relevant to an interpretation of the Agreement.
It is now settled that two or more writings which are all parts of one transaction relating to the same subject matter, are to be read and interpreted as one instrument, whether or not they refer to each other. Lawrence v. Tandy & Allen, Inc., 14 N.J. 1, 6, 100 A.2d 891 (1953)____The instruments need not be executed on the same day nor each contain a separate mention of consideration.
[Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 140 A.2d 422 (App.Div.1958).]
Accord Van Orman v. American Ins. Co., 680 F.2d 301, 306 (3d Cir.1982).
The June 13, 1998 prospectus for the EDA bonds contains a section entitled “Risk Factors” which describes various risks relating to the bonds and states as follows under the heading “Other Taxation and Indebtedness”:
In addition to the PILOT Payments and Special Assessments, the property constituting Jersey Gardens will be subject to real estate taxes on the underlying land and may be subject to additional taxes, assessments and fees imposed in the future ... Neither the Trustee nor the Bondholders have any rights (including consensual rights) with respect to ... any imposition of any other governmental taxes, assessments and fees. A significant burdening of the property by such amounts could adversely affect the market value of the property, thereby adversely affecting the sale of tax sale certificates and proceeds of foreclosure, and could *287 adversely affect the willingness and ability of the Owner [(plaintiff)] (and the Redeveloper [ (Elizabeth MetroMall) 1) to pay the PILOT Payments and Special Assessment when due.
The bonds were re-funded in 2002. The prospectus in connection with the re-funding, dated May 17, 2002, under the heading “Other Taxation and Indebtedness,” contains the same language quoted from the initial prospectus plus the following statements:
The City has covenanted in the Financial Agreement, but only to the extent permitted by law, that so long as any of the Bonds remain outstanding, the City shall not impose any other payments in lieu of taxes or special assessments on the Site or improvements thereon, and shall not impose any ad valorem property taxes on any improvements on the Site, without the prior written consent of the owners of at least 66 %% in aggregate principal amount of outstanding Bonds. The City is not precluded from imposing, and has imposed, ad valorem property taxes on the land portion (not including the improvements thereon) of the Site.
Based on the quoted language, I find that both prospectuses contemplated a potential, significant increase in the property tax assessment on the subject land.
The Exemption Ordinance also is relevant to an interpretation of the Financial Agreement. Section 3 of the Ordinance expressly provides that “[t]he obligation to pay real property taxes on the assessed value of the land of the Project Site shall not be abated, and the City shall distribute such taxes received in the manner required by law in the absence of the adoption of this tax abatement.” This is the only language in the Ordinance relating to tax assessments on land, and does not reflect any understanding on the part of the governing body of defendant that the land assessment would be limited or frozen.
Another pertinent consideration in interpreting the Financial Agreement is defendant’s inability, as a matter of law, to control the amount of the assessment imposed by the municipal tax assessor on the subject land. I have previously discussed the assessor’s independence as follows:
The New Jersey courts have consistently recognized the importance of independent judgment by tax assessors. In 1872, the then-Supreme Court described “the chief duty enjoined upon the assessor” as “the making up by him of independent judgment as to the actual value of the property to be assessed----” Keeler v. Tindall, 86 N.J.L. 97, 98 (Sup.Ct.1872). Similarly, in Arace v. Town of Irvington, 75 N.J.Super. 258, 183 A.2d 104 (Law Div.1962), the court held that a municipal governing body cannot interrogate an assessor as to assessment methodology because: “In determining property values, assessors, like judges, should perform *288 their duties without fear or favor. Their quasi-judicial duties should be exercised free of pressure and harassment.” Id. at 269, 183 A.2d 104, 111. See also Ream v. Kuhlman, 112 N.J.Super. 175, 190, 270 A.2d 712 (App.Div.1970) (noting the “paramount importance that the integrity of [the assessor’s] office be in no way diluted by local interference”).
[Snyder v. Sparta Tp., 16 N.J.Tax 321, 327 (Tax 1997).]
See also Mobil Oil Corp. v. Greenwich Tp., 20 N.J.Tax 66, 79-82 (Tax 2002) (discussing the role of the assessor in relation to the municipality in which he or she serves). Defendant’s inability to dictate the assessment on the subject land suggests that defendant did not agree to freeze the assessment because such an agreement would be unenforceable.[2]
Based on the foregoing discussion, and notwithstanding the testimony of plaintiffs vice-president and attorney, I conclude that defendant did not agree to freeze the tax assessment on the subject land. Such a limitation may have been desired by plaintiff and discussed with defendant, but the Financial Agreement does not contain or reflect the acceptance by defendant of a limitation. Consequently, I find as a matter of fact that the Financial Agreement did not encompass or incorporate a freeze on the assessment on the subject land.
III.
The Exemption Ordinance
Even if defendant’s representatives intended the Financial Agreement to freeze the assessment on the subject land, the Exemption Ordinance did not authorize such a freeze. Under Section 9 of the Ordinance, defendant’s mayor was authorized “to execute a financial agreement (the “Financial Agreement”) incorporating the terms of the [Local Redevelopment and Housing Law] and this ordinance, with the advice of the City Attorney and special counsel to the City.”
*289 As set forth above, Section 3 of the Exemption Ordinance specifically provided that land taxes “shall not be abated” and shall be distributed “in the manner required by law in the absence of the adoption of this tax abatement.”
The language of the Exemption Ordinance does not permit the inclusion in the Financial agreement of a freeze or limitation on the tax assessment on the subject land. Consequently, any agreement for a freeze or limitation would be ultra vires and invalid. In Naseef v. Cord, Inc., 90 N.J.Super. 135, 216 A.2d 413 (App. Div.), aff'd on other grounds, 48 N.J. 317, 225 A.2d 343 (1966), the Appellate Division held as follows with respect to municipal agreements exceeding the authority conferred by ordinance:
It is a rule of general application that any bargain is illegal if its formation or performance is prohibited by statute, and it will not be enforced in the courts. It seems to us that the same rule applies to municipal ordinances, especially where, as here, the ordinance is passed by the municipality in the exercise of an authority expressly delegated to it by the State. Pro tanto, Newark was exercising the State’s sovereignty, and we see no reason why we should aid in the violation of this ordinance any more than we would assist in the violation of a statute.
[Id. at 142, 216 A.2d 413 (citations omitted).!
In executing the Financial Agreement, defendant acted pursuant to the requirement of the Long Term Law that “[ejvery approved project shall be evidenced by a financial agreement between the municipality and the urban renewal entity.” N.J.S.A 40A:20-9. Defendant’s authority was restricted by the Exemption Ordinance. Therefore, a freeze or limitation on the tax assessment on the subject land would violate that authority, and, under Naseef is unenforceable.
IV.
The Long Term Law.
The Financial Agreement provides that it “shall be governed by the laws of the State of New Jersey, including the provisions of the Long Term Tax Exemption Law, as amended and supplemented,----” The provisions of the Long Term Law in effect when the Financial Agreement was signed did not provide a tax exemption for land. N.J.S.A. 40A:20-9 required that a finan *290 cial agreement permit that “all improvements in the project to be constructed or acquired by the urban renewal entity shall be exempt from taxation.” In Section 12, the Law contemplated an exemption for “rehabilitation or improvements made in the development or redevelopment of a redevelopment area or area a pertinent thereto.” N.J.S.A. 40A:20-12. These two sections were amended by L. 2003, c. 125, §§ 9 and 12 to permit an exemption for land on which housing is constructed. The subject land would not qualify for this exemption, because the Improvements do not include housing. Most significantly, in a provision not amended by L. 2003, c. 125, the Long Term Law provides:
Against the annual service charge the urban renewal entity shall be entitled to a credit for the amount, without interest, of the real estate taxes on land paid by it in the last four preceding quarterly installments.
[N.J.S.A 40A:20-12.]
When read together, these statutory provisions provide no property tax exemption for land, except to the extent permitted by L. 2003, c. 125, and require that land included in a “project” as defined in the Long Term Law, be assessed on the same basis as all other land in the municipality.
If the Financial Agreement attempted to deviate from the mandates of the Long Term Law, the relevant provisions would be invalid. “A contract provision that is contrary to the requirements of a statute is void.” Bryant v. City of Atlantic City, 309 N.J.Super. 596, 629, 707 A.2d 1072 (App.Div.1998) (citations omitted). See also City of Asbury Park v. Castagno Tires, 13 N. J.Tax 488, 504 (Tax 1993) (citing Summer v. Teaneck Tp., 53 N.J. 548, 554, 251 A.2d 761 (1969)) (“[A] municipality may not contradict a policy of the Legislature, either by permitting what a state statute forbids or by forbidding what a state statute permits.”).
V.
Constitutional Issues.
Assuming that the Financial Agreement contemplated a freeze of the tax assessment on the subject land, that the Exemption Ordinance authorized the freeze, and that a freeze is permitted *291 under the Long Term Law, the freeze nevertheless would be invalid because provisions of the Long Term Law permitting such an agreement would be invalid under the Uniformity Clause of the New Jersey Constitution. This clause provides as follows:
Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise provided herein, and such property shall be taxed at the general rate of the taxing district in which the property is located, for the use of such taxing district.
[N.J. Const. art. VIII, § 1, ¶ 1.]
Plaintiff acknowledges that, under its interpretation of the Financial Agreement, the subject land would be assessed using a standard of value different from that applicable to other land in the City of Elizabeth. Plaintiff asserts that I should interpret the Constitution and the Long Term Law in a practical matter to effectuate the public purpose of the redevelopment of blighted areas and, specifically, the reclamation of landfills. In particular, plaintiff asserts that the evils which the Uniformity Clause is intended to prevent — the imposition of disproportionate tax burdens on some taxpayers and the deprivation of municipal revenues — do not arise in the current context.
Plaintiff notes that defendant will receive taxes attributable to the subject land of approximately $175,000 per year and will receive franchise assessment revenues of at least the following guaranteed amounts: no guarantee for the first year after the certificate of occupancy for Jersey Gardens is issued (the certificate was issued on January 11, 2000), $4,100,000 for the next year, $4,900,000 for the third year, and for each year thereafter, the sum of $5,600,000 until either (i) the franchise assessments collected by defendant for two consecutive twelve month periods equal or are greater than $6,400,000 or (ii) the amount of sales subject to the franchise assessment exceeds certain percentages of total sales. Plaintiff contends that, as a result, defendant will receive revenues from the Project which are greater than those that would be received if the subject land were subject to full assessment and the land taxes were credited against the PILOT.
*292 Plaintiffs argument is factually incorrect and unsupported by relevant case law. The major factual flaw in plaintiffs analysis is the inclusion of the PILOT as revenue to defendant. The PILOT is assigned to the trustee for the EDA bonds for payment of the bonds, and cannot be treated as revenue to defendant. When the PILOT is excluded, the revenue to defendant under plaintiffs interpretation of the Financial Agreement is substantially less than the revenue under defendant’s interpretation. Real property taxes payable for 2001 on the subject land, as assessed, equal $1,683,853.86 (assessed value of $13,758,100 times the 2001 tax rate of $12,239 per $100 of assessed value). The actual total revenue to defendant for 2001, therefore, consisted of this amount plus guaranteed franchise assessment revenues of $4,100,000, for a total of almost $5,800,000. Under plaintiffs interpretation of the Financial Agreement, but excluding the PILOT, defendant would have received only approximately $4,300,000 ($1,601,500 times $12,239 per $100 equals $196,007.59; plus $4,100,000). A discrepancy of this $1,500,000 magnitude, attributable solely to the difference in the parties’ respective interpretations of the Financial Agreement’s provisions as to the assessment of land taxes, will continue throughout the term of the Financial Agreement (subject, of course, to the tax rate and amount of land assessment for each year).
The legal basis for plaintiffs position is as flawed as its factual contentions. Our Supreme Court has applied the Uniformity Clause strictly in accordance with its express language. In Switz v. Kingsley, 37 N.J. 566, 182 A.2d 841 (1962), the Court stated: “Article VIII, § 1, Par. 1 plainly requires the application of the same standard of value and the same rate of tax to all real property taxable for local use.” Id. at 585, 182 A.2d 841. Based on this application of the Uniformity Clause, the Court held unconstitutional a statute which mandated that, in assessing acreage devoted to agricultural use, the taxable value “shall not be deemed .to include prospective value for subdivisions or nonagrieultural use.” The invalidation of this statutory provision resulted in a 1963 amendment to the Constitution, N.J. Const. art. VIII, *293 § 1, ¶ 1(b), permitting different treatment of land actively devoted to agricultural or horticultural use.
The importance of the Uniformity Clause is reflected in the Supreme Court’s decision in New Jersey State League of Municipalities v. Kimmelman, 105 N.J. 422, 522 A.2d 430 (1987). There, the Court considered the constitutionality of a statute providing that newly constructed, unoccupied residential units were exempt from taxation during the period of vacancy, not to exceed twenty-four months. The statute was defended on the basis of the constitutional provision permitting the Legislature to grant exemptions, N.J. Const. art. VIII, § 1, ¶ 2. After reviewing the history of the constitutional provisions, particularly the Uniformity Clause, the Court concluded that the Uniformity Clause prevailed over the exemption clause:
Given that the constitutional focus of the delegates on the taxation of real estate was upon a judicial decision that had sustained the power of the Legislature, prior to the 1947 Constitutional Convention, to allow for the preferential taxation of real estate based on the classification of the industry, and given that the single galvanizing event that brought about agreement on a tax article was a compromise that gave greater flexibility to the executive and legislative branches in taxing all types of property other than real estate, with the apparent purpose of providing that real property dedicated to municipal tax purposes should never be taxed at an unequal burden, we cannot conclude that the delegates intended that the Legislature could achieve, by the Exemption Clause, what could not be done under the constitutional restraints imposed upon it.
[Id. at 436, 522 A.2d 430 (citation omitted).]
The Court noted that, even though the statute in question had a public purpose, to aid the ailing construction industry, that purpose was not sufficient to justify a violation of the express requirements of the Uniformity Clause. The Court relied upon Switz v. Kingsley, supra, 37 N.J. 566, 584, 182 A.2d 841 for the proposition that the Uniformity Clause “explicitly forbids preferential treatment.”
The Supreme Court recently reiterated the significance of the Uniformity Clause in 2nd Roc-Jersey Assocs. v. Morristown, 158 N.J. 581, 731 A.2d 1 (1999):
The history of the [New Jersey] Constitution’s tax clauses underscores Now Jersey’s strong and firm policy that strictly mandates uniformity in the imposition of real property taxes.
*294 ... The proposed tax clause [N.J. Const, art. VIII, § 1, ¶ 1] was passed in its current form, raising a constitutional bar against the preferential treatment of one industry or class of property. That constitutional prohibition against preferential tax treatment of any type or class of real property has been expressly acknowledged, fully recognized, and consistently followed by the courts____
Both constitutional history and judicial precedent adjure a strict application of the tax clauses to real property.
[Id. at 590-91, 731 A.2d 1.]
The eases cited by plaintiff in support of its contentions do not authorize greater flexibility than that contemplated in the foregoing decisions. Thus, Redfern v. Board of Comm’rs of Jersey City, 137 N.J.L 356, 59 A.2d 641 (E & A 1948), involved an interpretation of the 1844 Constitution not the 1947 Constitution. The Court held that the pressing need for public housing justified an exemption for property providing that housing. As discussed in League of Municipalities, supra, 105 N.J. at 428-37, 522 A.2d 430, the 1947 Constitution involved significant changes in the scope of exemptions from those permitted under the 1844 or 1875 Constitutions. Accordingly, the Redfem decision is not relevant to a determination of the impact of the Uniformity Clause on plaintiffs claim of a limitation on the subject land’s tax assessment.
Roe v. Kervick, 42 N.J. 191, 199 A.2d 834 (1964), another decision upon which plaintiff relies, did not involve the Uniformity Clause. The Supreme Court there held that, for purposes of interpreting what constituted a public purpose for which the State of New Jersey could lend money under N.J. Const., art. III, § 2, ¶¶ 2 and 3, the concept of public use “must expand when necessary to encompass changing public needs of a modern dynamic society.” Id. at 207, 199 A.2d 834. The Court held that, under a statute having a purpose to alleviate unemployment, a loan from the State used by a private redeveloper with whom the State redevelopment agency had contracted, was permissible because the redeveloper was subject to a sufficient degree of control by a public authority that the redeveloper constituted “a special public agent for the paramount purpose of devoting the money to relief of unemployment.” Id. at 222, 199 A.2d 834. The Supreme Court’s interpretation of “public purpose” under Article III provisions relating to the loans by the State does not indicate the appropriate interpre- *295 taüon of the Uniformity Clause. Defendant does not dispute that the Jersey Gardens project created employment and had other benefits for the City of Elizabeth. Consequently, under Article III, the State may be permitted to lend money for use by a private developer. This does not mean, however, that public policy considerations warrant or justify a deviation from the strict requirements of the Uniformity Clause.
Plaintiff also cites Jamouneau v. Local Government Board, 6 N.J. 281, 78 A.2d 553 (1951) and Spoerl v. Pennsauken Tp., 14 N.J. 186, 101 A.2d 855 (1954), neither of which provides any support for plaintiffs contentions. In Jamowneau, our Supreme Court held that a municipality, as lessor, may be required to pay property taxes from rent it receives under a lease for a non-public purpose. Id. at 291, 78 A.2d 553. This holding cannot be interpreted, as asserted by plaintiff, to mean that a municipality may, in effect, waive the payment of a portion of property taxes. A municipality and a taxpayer “are not at liberty to stipulate for assessments contrary to the lawful standard, whatever that may be.” City of Passaic v. Botany Mills, Inc., 59 N.J.Super. 537, 542, 158 A.2d 205 (App.Div.1960). In Spoerl v. Pennsauken Tp., supra, 14 N.J. at 193, 101 A.2d 855, the Supreme Court expressly limited its discussion to special assessments for benefits resulting from municipal improvements, there sewer improvements, id. at 189-90, 101 A.2d 855, and noted that “[o]ur own courts have adopted the view that an agreement to relieve property from taxation is contrary to basic notions of equity.” (Citation omitted). Therefore, the Court’s indication that, for adequate consideration, a municipality could relinquish the right to assess property for benefits received does not support plaintiffs contention that a municipality may agree to assess one property using a standard of value not applied to any other property.
The Uniformity Clause prohibits any freezing of, or limitation on, the assessment on the subject land. Even if the Long Term Law permitted an agreement to freeze a tax assessment (and, for the reasons set forth above, I hold that the Law does not permit such an agreement), the applicable provisions off the Long Term Law would be invalid as violative of the Uniformity Clause. I *296 need not address the contentions of the parties with respect to whether any limitation on the assessment on the subject land violates the five year limitation on abatements contained in N.J. Const. art. VIII, § 1, ¶ 6.
Based on the preceding analysis, I conclude as follows: a) under the Financial Agreement, and relevant other documents, the parties did not agree that the property tax assessment on the subject land would be frozen or otherwise limited; b) no such agreement was authorized by the Exemption Ordinance; c) the Long Term Law does not permit the assessment to be frozen or otherwise limited on a basis not applicable to all other properties in the City of Elizabeth; and d) under the Uniformity Clause of the New Jersey Constitution, any provision in the Long Term Law permitting such a limitation would be invalid. Therefore, defendant’s assessor had the right under the Financial Agreement, and the obligation under applicable law, to assess the subject land under the same standard of value as applied to other land in the City of Elizabeth.
The parties have agreed that, if the assessment on the subject land is not frozen or otherwise limited, the issue of the value of the subject land as of October 1, 2000, the assessment date for tax year 2001, must then be determined.[3] A tidal date for that determination will be scheduled.

 This matter was filed initially in the Superior Court as an action in lieu of prerogative writs. It was transferred to the Tax Court by Order of the Superior Court dated May 30, 2001. See N.J.S.A. 2B:13-2b (conferring on the Tax Court jurisdiction over matters involving taxation that are transferred from the Superi- or Court).

 The recent amendment to N.J.S.A. 40A:20-12, included in L. 2003, c. 125, § 12, which provides for a tax exemption to continue for the duration of the term of a financial agreement, has no effect on this analysis. The amendment does not relate to assessment of non-exempt land.

 Neither party has asserted that, if the assessment on the subject land is not • frozen, the entire Financial Agreement should be invalidated.