**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

-------------------------------------------------------x

| | |
|---|---|
| BLOOMINGDALE'S, INC. and BLOOMINGDALE'S C/O FEDERATED DEPARTMENT STORES, INC., : | TAX COURT OF NEW JERSEY DOCKET NOS.: 006396-2016 007619-2016, 004282-2017 006959-2018, 003279-2019 004117-2020 |

          Plaintiff,     :

v.     :    <u>Civil Action</u>

     :

HACKENSACK CITY,     :

     :

          Defendant.     :

-------------------------------------------------------x

> **Approved for Publication**
> **In the New Jersey**
> **Tax Court Reports**

Decided: August 8, 2022[1]  Publication date: September 28, 2022

Gregory S. Schaffer and Adam R. Jones for plaintiff (Garippa, Lotz & Giannuario, P.C., attorneys).

Kenneth A. Porro for defendant (Chasan Lamparello Mallon & Cappuzzo, P.C., attorneys).

NOVIN, J.T.C.

This shall constitute the court's opinion following phase one of trial in the above-referenced local property tax appeals. Bloomingdale's, Inc. and Bloomingdale's c/o Federated Department Stores, Inc. (collectively "Bloomingdale's") challenge the 2016, 2017, 2018, 2019, and 2020 tax year assessments on its improved property located in Hackensack, New Jersey. At issue in phase one of trial is whether the subject property's 2016, 2017, 2018, 2019, and 2020 local property tax assessments are entitled to a presumption of validity.[2]

---

[1] This opinion was issued by the court as an unpublished opinion on August 8, 2022. It was subsequently approved for publication on September 22, 2022. Minor editorial changes have been made to the original opinion.

[2] At trial, Bloomingdale's counsel informed the court that in addition to issues of property valuation and discrimination, it contended that no presumption of validity should attach to the

1

For the reasons stated more fully below, the court concludes that the subject property's 2016, 2017, 2018, 2019, and 2020 tax years local property tax assessments represent the valid exercise of governmental authority and, therefore, must be accorded a presumption of validity.

## I.  Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.[3]

As of the valuation dates, Bloomingdale's was the owner of the real property and improvements on State Highway Route 4, Hackensack, Bergen County, New Jersey (the "subject property").  The subject property is identified on Hackensack's ("Hackensack") municipal tax map as block 504.02, lot 12.01.  The subject property comprises the Bloomingdale's retail store at the Shops at Riverside, a regional shopping mall in Hackensack.

As of each valuation date, the subject property's tax assessment is set forth below:

| Valuation date | Tax assessment |
|---|---|
| 10/1/2015 | $41,221,500 |
| 10/1/2016 | $47,969,600 |
| 10/1/2017 | $51,098,000 |
| 10/1/2018 | $70,000,000 |
| 10/1/2019 | $70,000,000 |

During phase one of trial, testimony was elicited from Arthur Carlson, Jr., Hackensack's

_____

subject property's (as defined herein) tax assessments under Hackensack's (as defined herein) annual reassessment program.  Bloomingdale's argued that because Hackensack was ineligible to conduct an annual reassessment program, all tax assessments determined in accordance therewith were invalid, arbitrary, and flawed.  After conferencing the matter with Bloomingdale's counsel and Hackensack's counsel, the court bifurcated the trial, under R. 4:38-2(a).  The court concluded that it would first determine whether a presumption of validity would attach to the subject property's tax assessments.  Thereafter, the court would address matters involving the subject property's valuation and discrimination claims.

[3]  Hackensack requested the court conduct an inspection of the subject property.  The court declined Hackensack's request and placed a statement of reasons on the record.

municipal tax assessor, and Ernest F. "Rick" DelGuercio, Jr., former President of Appraisal Systems, Inc. ("ASI"), the company charged with conducting Hackensack's full or district-wide reassessment program for the 2016 tax year, and annual reassessment program for the 2017, 2018, 2019, and 2020 tax years.

## II.   Conclusions of Law

In New Jersey, all "[p]roperty shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally . . . shall be assessed according to the same standard of value. . . ." N.J. Const. art. VIII, § 1, ¶ 1(a). That "tenet has been a construct of the New Jersey Constitution since 1844." City of Elizabeth v. 264 First St., LLC, 28 N.J. Tax 408, 425 (Tax 2015) (citing N.J. State League of Municipalities v. Kimmelman, 105 N.J. 422, 428 (1987)). Our Supreme Court has interpreted said provision as affording taxpayers a right to "[e]quality of treatment in sharing the duty to pay real estate taxes." Murnick v. Asbury Park, 95 N.J. 452, 458 (1984). In sum, taxpayers must be treated in a manner commensurate with "other similarly-situated taxpayers." Regent Care Ctr., Inc. v. Hackensack City, 362 N.J. Super. 403, 412 (App. Div. 2003).

Echoing those constitutional principles, our statutes require that "[a]ll real property subject to assessment and taxation . . . shall be assessed according to the same standard of value. . . ." N.J.S.A. 54:4-2.25. Moreover "[a]ll property . . . within the jurisdiction of this State . . . shall be subject to taxation annually under this chapter. Such property shall be valued and assessed at the taxable value prescribed by law." N.J.S.A. 54:4-1. Against that backdrop, a municipal tax assessor is charged with the duty of "determin[ing] the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale. . . ." N.J.S.A. 54:4-23. Nonetheless, a tax assessor's "fulfillment of the statutory

obligation cannot, of course, conflict with constitutional limitations." Regent Care Ctr., Inc., 362 N.J. Super. at 415; see e.g. Twp. of West Milford v. Van Decker, 120 N.J. 354, 362 (1990) (concluding that "arbitrary intentional discrimination . . . is unconstitutional"). Rather, tax assessors bear "a statutory obligation to monitor all available indicia of property value and to correct inequities in tax years other than years of district-wide revaluations" or district-wide reassessments. Schwam v. Cedar Grove Twp., 228 N.J. Super. 522, 528 (App. Div. 1988). As expressed by our Appellate Division, the "means best designed to meet" the dictates of the Uniformity Clause would necessitate district-wide revaluations or reassessments each and every year; however, such an approach is "simply not feasible." Regent Care Ctr., Inc., 362 N.J. Super. at 415 (citing Bergen Cty. Bd. of Taxation v. Borough of Bogota, 104 N.J. Super. 499, 507 (Law Div. 1969), aff'd. o.b., 114 N.J. Super. 140 (App. Div. 1971)).

Thus, absent implementation of a district-wide revaluation or district-wide reassessment, when a municipal tax assessor has a reasonable basis to believe that "property comprising all or part of a taxing district has been assessed at a value lower or higher than is consistent with the purpose of securing uniform taxable valuation . . . the assessor shall, . . . make a reassessment of the property in the taxing district that is not in substantial compliance" with the law. N.J.S.A. 54:4-23. It is unreasonable to expect "[a]ssessors . . . to do nothing in years between district-wide revaluations or [district-wide] reassessments. Their role is not that of a caretaker." Regent Care Ctr., Inc., 362 N.J. Super. at 416.

A.    District-wide or Full Reassessment Program, N.J.A.C. 18:12A-1.14(c)

Although several mechanisms are available for taxing districts and their municipal tax assessors to achieve equality amongst taxpayers in sharing the burden to pay real estate taxes, one of those tools is a district-wide or full reassessment of all property in the taxing district. As

4

concisely summarized by Judge Lasser,

> a [district-wide] reassessment is an important change in assessment practice in a taxing district, other than a revaluation, which results in a significant difference in the aggregate assessed valuation of that taxing district from one year to a following year, other than that caused by inclusion of added assessments or other new construction, and, further, which results in a variance in values from one year to a following year in a substantial number of individual parcels of real property in that same taxing district. Like a revaluation program, a proper [district-wide] reassessment program seeks to spread the tax burden equitably throughout a taxing district.
>
> [Ennis v. Alexandria Twp. (Hunterdon Cty.), 13 N.J. Tax 423, 426-27 (Tax 1993) (citing New Jersey Div. of Taxation, Handbook for New Jersey Assessors, §801.13 (3d ed. 1989)).]

The equality sought to be achieved by performing a district-wide or full reassessment program stems from making "adjustments to 100 percent of the line items," conducting an inspection of "the exterior of all properties in a municipality," and attempting to conduct an inspection of "[t]he interior of all properties" in a municipality prior to imposing the revised assessments. N.J.A.C. 18:12A-1.14(c)(3).

However, before proceeding with a district-wide or full reassessment program,

> [a]n assessor . . . shall submit an application to perform the reassessment with the county board of taxation and the Director of the Division of Taxation.
>
> 1. The application for district-wide reassessment shall be completed on Form AFR (Application for Full Reassessment) as prescribed by the Director of the Division of Taxation.
>
> 2. Prior to filing Form AFR, an assessor must notify, in writing, the mayor and local governing body, the county board of taxation, and the county tax administrator of the basis for the assessor's determination that the proposed reassessment is needed.
>
> . . .
>
> 4. The county board of taxation shall review the application and within 45 days of its submission, forward a copy to the Director of the Division of Taxation and the assessor with a notation of approval

5

or disapproval. In the case of a disapproval, the Director and the assessor shall be advised of the reason.

5. Within 45 days of receipt of the application from the assessor, the Director shall advise the county tax administrator and assessor of his or her determination as to whether the assessor may proceed with the reassessment program. In the case of disapproval, the Director shall specify the reason for his or her determination.

[N.J.A.C. 18:12A-1.14(c).]

Here, the record reveals that for the 2016 tax year, Hackensack implemented a district-wide or full reassessment program. First, Mr. Carlson notified, in writing, Hackensack's mayor and local governing body of "my suggestion that this [district-wide reassessment] program should be undertaken." Hackensack's mayor and governing body apparently then adopted a resolution to begin the district-wide or full reassessment program, retaining ASI to carry it out. On or about May 29, 2015, Mr. Carlson signed an Application for Full Reassessment Program, Form AFR, and submitted it to the Bergen County Board of Taxation and the Director, New Jersey Division of Taxation (the "Director"). The Form AFR certified that: (i) inspections of the interior and exterior of all improvements within Hackensack will be performed; (ii) the Real Property Appraisal Manual for New Jersey Assessors will be used to develop appropriate depreciated replacement costs for all residential improvements as of October 1 of the pretax year; (iii) all land assessments will be updated; (iv) all exempt property tax assessments will be updated; (v) all property sales occurring within the past three years will be analyzed; (vi) all applicable approaches to value will be employed and reconciled; and (vii) that "the valuation updating process will be performed by individual(s) other than the assessor and his or her municipal staff."

On or about June 10, 2015, the Bergen County Board of Taxation's Administrator approved, and on or about June 26, 2015, the Director approved Hackensack's Form AFR, Application for Full Reassessment Program.

6

Accordingly, based on the record and testimony presented, the court is satisfied that Hackensack adhered to the conditions precedent necessary to implement a district-wide or full reassessment program for the 2016 tax year.

In addition, the court finds, based on the testimony and evidence adduced during phase one of trial that Hackensack adhered to the requirements under Form AFR and N.J.A.C. 18:12A-1.14 (the "Regulations") in conducting the 2016 district-wide or full reassessment program. Specifically, Form AFR requires that "a taxpayer orientation program . . . be conducted to generally describe the reassessment program and its purpose." Form AFR further demands that a "notice . . . be sent to all taxpayers to inform them of their proposed assessed value. . . ." Moreover, subsections (d) and (e) of the Regulations demand that following approval by the Director of a district-wide or full reassessment program,

> (d) [t]he assessor . . . submit a plan of work to the county tax administrator within 30 days of such approval. Thereafter, a report on the status of the revaluation or reassessment shall be filed with the county tax administrator every 30 days until the program has been completed and the tax list has been filed with the county board of taxation.
>
> (e) The plan of work and revaluation progress report shall be completed on Form POW/RSR (Plans of Work/Revaluation Status Report) as prescribed by the Director. . . .
>
> [N.J.A.C. 18:12A-1.14(d) and (e).]

Following approval of the district-wide or full reassessment program, Hackensack and ASI sent out booklets and letters to all taxpayers notifying them about implementation of the program and informing them that inspections would be conducted. Admittedly, Mr. Carlson stated that his memory was "jumbled up." However, he recalled attending a public meeting that he believed was the taxpayer orientation program and sat on a dais, answering questions about the district-wide or full reassessment program.

Mr. DelGuercio's testimony cemented Mr. Carlson's recollection, stating that in 2015 ASI conducted at least one public orientation program. According to Mr. DelGuercio, "we might have had several, but I can't confirm . . . but I know -- it's standard procedure for all the reassessments and reval[uation]s that I do."

Moreover, information about Hackensack's district-wide or full reassessment program was contained on ASI's website.[4] According to Mr. DelGuercio, ASI's website,

> offers . . . a tool where it's interactive where appointments can be made, discussions can be had, information can be exchanged as well as the viewing of essential reassessment reports and tools such as neighborhood delineations, assessments. There's a tax implication tool and feature to it. There's a lot of good information.

Mr. DelGuercio further testified that ASI prepared a computerized inspection log sheet for the 2016 tax year detailing the approximately "10,217 line items" in Hackensack to be inspected. According to Mr. DelGuercio, the designation of an "x" next to a street address on the inspection log sheet meant "an attempt was made [to inspect the interior] but it means that we did not get inside, and we most likely had to estimate the interior, which is the process." According to Mr. DelGuercio, ASI was granted access to conduct interior inspections of approximately 7,359 line items for the 2016 tax year.

During the district-wide or full reassessment program, monthly meetings were conducted by the Bergen County Board of Taxation to oversee the progress of the program. ASI would generate monthly plans of work reports and furnish them to Mr. Carlson, who would provide them to the Bergen County Board of Taxation, identifying the number of properties inspected.

---

[4] Hackensack's website apparently contained a hyperlink to ASI's website. According to Mr. DelGuercio, "there's a link on the City['s website] which if you go on the -- at that point in time, I don't know if it's still there, but in that point in time if you went on the City['s] website you could find directions to our website."

According to Mr. DelGuercio,

> the Bergen County Board of Taxation requires the assessor to submit a progress report, a monthly progress report, and it's discussed at their monthly tax board meetings. We did that and if there are any questions about our progress by the actual authority that supervises the assessor, it's brought up at that time. The tax board meets every month, I think, with the exception of August. I'm not sure if they meet in August but they meet 11 times a year.

According to Mr. Carlson, he was responsible for overseeing the reassessment program; however, the day-to-day operations, including gathering property information, analyzing market data, identifying the properties to be inspected, conducting the interior and exterior inspections, and "formulat[ing] the [preliminary] numbers" rested with ASI. Mr. Carlson testified that,

> I sit and I meet with the representatives. We go through the deals. They give me these spreadsheets . . . usually they're preliminary, then the ultimate values to go through, the assessed valuations to double check them with the representatives at ASI. I do that usually on a monthly meeting with them . . . We sit down and go through the list before I finalize them and if anything stands out, we try to, we try to correct it. If it's too low, we raise it. If it's too high, we lower it . . . that's my role, but of course . . . it's in conjunction with my experts too . . . like I said, I'm responsible. I'm the final arbiter. I make the final decision but in conjunction with my expert[s].

Mr. Carlson further reinforced that "I'm the decision guy . . . if I feel [the assessed value is] too high, I'll lower it. If I feel [the assessed value is] too low, I'll say, why is this low. Why are we here or, they'll [ASI] take the initiative and say this assessment's too low."

Finally, in Mr. DelGuercio's estimation,

> around [the] end of November, early December [2015] after the assessor has reviewed and signed off on all of the preliminary values, my office [ASI] sends out another mailer which informs the public of the preliminary -- the new preliminary assessment and what steps to take next. Typically, you can either go on our website and obtain information as to how this value was arrived at or we do still hold one-on-one and in-person meetings with any and all taxpayers who have questions, you know, about what we did. And a lot of times re-inspections are done, more information is obtained

9

and exchanged and then, ultimately, when that final review process takes place and the assessor is satisfied again with the values, at that time it gets submitted to the Bergen County Board of Taxation for the final tax list.

Bloomingdale's offered no fact or expert witness testimony contradicting or refuting the testimony of Mr. Carlson or Mr. DelGuercio. In addition, Bloomingdale's offered no evidence that for the 2016 tax year: (i) exterior inspections were not conducted on all properties; (ii) interior inspections were not attempted on all properties; (iii) 100% of Hackensack's line items were not revised; (iv) inclusion of Hackensack on the Director's "2016 Approved Revaluation and Reassessments" list was in error;[5] (iv) following the district-wide or full reassessment program, Hackensack had segmented or general coefficients of deviation for the 2016 tax year exceeding 15%; or (v) that Hackensack's district-wide or full reassessment program did not result in a material change in aggregate assessed valuations for the 2016 tax year.[6]

Accordingly, based on the trial record and testimony of Mr. Carlson and Mr. DelGuercio, the court is satisfied that Hackensack conducted a district-wide or full reassessment program for the 2016 tax year in accordance with the requirements under law, Form AFR, and N.J.A.C. 18:12A-1.14(c).

B.   Annual Reassessment Program, N.J.A.C. 18:12A-1.14(i)

In 2013, our Legislature enacted the Real Property Assessment Demonstration Program,

---

[5]    2016 Approved Revaluations and Reassessments, www.state.nj.us/treasury/taxation/pdf/lpt/revaluation/2016RevalList.pdf (last visited July 25, 2022).

[6] "[T]he coefficients of deviation used by the Board to assess . . . tax inequality were general, which measure deviation without regard to property class, property size, or any other property characteristic. The language of N.J.A.C. 18:12A-1.14(b), however, does not limit the 15% acceptable deviation standard to any particular type of deviation, whether segmented or general." Essex Cty. Bd. of Taxation v. W. Caldwell Twp., 21 N.J. Tax 188, 196 (App. Div. 2003) (emphasis added).

10

N.J.S.A. 54:1-101 to -106 (the "RPADP"). A primary goal of the RPADP was to make use of available technology, creating a "collaborative system" of property assessment between county boards of taxation and municipal assessors, "result[ing] in a cost-effective and accurate process of real property assessment to benefit real property owners and property taxpayers." N.J.S.A. 54:1-102.

The sponsor and committee statements accompanying the RPADP legislation emphasized that "all future evaluations and reassessments of real property by municipalities in a demonstration county will be performed on the county system, and the system will also be used for other assessment-based functions, such as the development of a compliance plan, maintenance of assessments, and the calculation of added assessments." Sponsor's Statement to S. 1213 19 (January 23, 2012); Assembly Appropriations Committee Statement to S. 1213 1 (December 13, 2012) (emphasis added). "The bill[s] [further] require[] the county board of taxation of each demonstration county to compel the implementation of a revaluation or reassessment of real property." Sponsor's Statement to S. 1213 20; Assembly Appropriations Committee Statement to S. 1213 2-3 (emphasis added).

In August 2016, following enactment of the RPADP, the Director promulgated proposed changes to the Regulations, crafting a "[n]ew subsection (i) [under N.J.A.C. 18:12A-1.14] . . . proposed for the purposes of equity and reducing costs because of the changes affecting only certain counties under [the RPADP] N.J.S.A. 54:1-101." 48 N.J.R. 1605(a) (emphasis added).

In two published opinions, this court has analyzed the similarities and differences between a full or district-wide reassessment program, under N.J.A.C. 18:12A-1.14(c), and an annual reassessment program, under N.J.A.C. 18:12A-1.14(i), and their impact with respect to application of N.J.S.A. 54:51A-8 (the "Freeze Act").

11

In Tartivita v. Borough of Union Beach, 31 N.J. Tax 335 (Tax 2019), aff'd, 2021 N.J. Super. Unpub. LEXIS 1022 (App. Div. 2021) (approved for publication in the N.J. Tax Reports), the Monmouth County Board of Taxation issued a judgment reducing the assessment on the taxpayer's home for the 2017 tax year. Id. at 339. The taxpayer argued that she was also entitled to relief under the Freeze Act for the 2018 tax year. In response, the taxing district maintained that it implemented an annual reassessment program, under the RPADP and N.J.A.C. 18:12A-1.14(i), involving all property in the taxing district; therefore, the Freeze Act relief was inapplicable. After analyzing and scrutinizing the language and intent of the RPADP, Judge Sundar concluded that:

> The [RP]ADP law does not support the proposition that the annual assessments performed under the aegis of the [RP]ADP law are a 'complete reassessment' under the Freeze Act, or a 'district-wide' reassessment under N.J.A.C. 18:12A-1.14(c).
>
> [Id. at 343.]

The court further observed that a "complete" or "district-wide reassessment," as contemplated under the Freeze Act, "'results in a significant difference in the aggregate assessed valuation of that taxing district from one year to a following year, other than that caused by inclusion of added assessments or other new construction'" and "'results in a variance in values from one year to a following year in a substantial number of individual parcels of real property in that same taxing district.'" Id. at 359 (quoting Ennis, 13 N.J. Tax at 426-27).

After evaluating the evidence presented, the court found the net change in the taxing district's aggregate assessed valuations following the annual reassessment program was 4.9%, which it found, "is not a 'significant difference in the aggregate assessed valuation of that taxing district from one year to a following year.'" Ibid. Rather, the court reasoned that in undertaking the annual reassessment program, the municipal tax assessor was "annually performing what [he] is obligated to be annually performed under N.J.S.A. 54:4-23, which therefore should result in

12

minimal changes from one year to the next with a non-significant number of properties being over/under assessed." Id. at 362. In sum, the court concluded that "[N.J.A.C. 18:12A-1.14] [s]ubsection (i) does not apply to district-wide reassessments" and that an "annual reassessment is not the same as the regulatory district-wide [or full] reassessment. . . ." Id. at 365.

In affirming Judge Sundar's decision, the Appellate Division observed that the trial record did not support the municipality's "contention that its [RP]ADP [annual] reassessment constituted a complete [district-wide] reassessment. . . ." Tartivita, 2021 N.J. Super. Unpub. LEXIS 1022, *2 (App. Div. 2021) (approved for publication in the N.J. Tax Reports). The court emphasized that under the RPADP annual reassessment program,

> only twenty percent of the total line items (properties) were thoroughly inspected by the tax assessor, and of the total line items, many had a less than one percent tax assessment change, either positively or negatively. This is not 'a significant difference in the aggregate assessed valuation of that taxing district from one year to a following year, other than that caused by inclusion of added assessments or other new construction,' to qualify as a complete assessment to circumvent the Freeze Act and to increase the property's tax assessment for the 2018 tax year.
>
> [Ibid. (quoting Ennis, 13 N.J. Tax at 426-27).]

In Pella Realty, LLC v. Paterson City, 31 N.J. Tax 474 (Tax 2020), the court entered judgments reducing the taxpayer's 2017 local property tax assessments. Thereafter, the taxpayer moved for Freeze Act protection for the 2018 tax year. In response, the taxing district argued that the taxpayer was not entitled to Freeze Act protection because it was conducting an "on-going annual reassessment program," under N.J.A.C. 18:12A-1.14(i), for the 2018, 2019, and 2020 tax years.

For substantially the same reasons expressed in Tartivita, the court found that "implementation of an annual reassessment program [under N.J.A.C. 18:12A-1.14(i)] will not

13

serve to bar application of the Freeze Act." Id. at 499. Importantly, the court observed that "'[i]n offering the new proposed regulation [N.J.A.C. 18:12A-1.14(i)] for public comment, the Director explained that '[n]ew subsection (i) is proposed for the purposes of equity and reducing costs because of the changes affecting only certain counties under [the RPADP] N.J.S.A. 54:1-101." Id. at 490-491 (citing 48 N.J.R. 1605(a)). The court further discerned that N.J.A.C. 18:12A-1.14(i) "represented a departure from the district-wide [or full] reassessments that had existed since 1979 under N.J.A.C. 18:12A-1.14(c)." Id. at 491.

After reviewing the Director's responses to the public comments to N.J.A.C. 18:12A-1.14(i), the court concluded that an annual reassessment program "was something unlike and different from a district-wide reassessment, and the terms should not be used synonymously." Id. at 491-92. The court concluded that "the Regulations conceiving of Annual Reassessment Programs under '[n]ew subsection (i)' were drafted to directly respond to and address the newly created requirements under the RPADP and to serve as a cost savings vehicle for those counties and taxing districts participating under the RPADP." Id. at 493.

Based on the court's plain reading of 48 N.J.R. 1605(a), the Regulations, and the Director's responses to public comments, the court found that the annual reassessment program memorialized under N.J.A.C. 18:12A-1.14(i), was designed for and "derived . . . under the RPADP." Id. at 494. Thus, the court reasoned that annual reassessment programs, under N.J.A.C. 18:12A-1.14(i), were "not intended to apply to every county and taxing district statewide; rather, they were applicable only to those 'demonstration count[ies]' participating under the RPADP." Id. at 494-95. However, because the taxing district was not located within an RPADP demonstration county, the court found that the taxing district's adoption and implementation of an annual reassessment program

14

was inappropriate.[7]

Here, in Mr. Carlson's opinion, the goal of implementing what he termed as a "rolling" annual reassessment program for the 2017, 2018, 2019, and 2020 tax years was to avoid the tax appeals "just piling up year after year" and "alleviate the tax refunds." It afforded him "flexibility, that's the main goal . . . in real time to make the changes based on the current conditions of the market." According to Mr. Carlson, Hackensack implemented a "four year[] [annual reassessment program] this time -- we want to do four years. The reason is . . . I think, one of the main reasons is because it's cheaper to do -- to do, like, to do it over multiple years because they [ASI] get paid every year."

It is uncontested that for each of the 2017, 2018, 2019, and 2020 tax years, Mr. Carlson signed and submitted a Form AFR-A, Application for Annual Reassessment Program to the Bergen County Board of Taxation and the Director.[8] Each Form AFR-A explicitly recited that Hackensack's last "100% [district-wide] reassessment was implemented [in] 2016."[9] Moreover, it is undisputed that despite not being designated a demonstration county participating under the RPADP, the Bergen County Board of Taxation, and the Director, approved Hackensack's

---

[7] The court did not reach a conclusion on whether the taxing district's annual reassessment program met the parameters of a district-wide or full reassessment program. Rather, the court set the matter down for a plenary hearing to decide that issue.

[8] For the 2017 tax year, Form AFR-A was signed by Mr. Carlson on April 15, 2016, approved by the Bergen County Board of Taxation Administrator on April 13, 2016, and approved by the Director on May 5, 2016. However, for the 2018, 2019, and 2020 tax years, only copies of the Form AFR-A, signed by Mr. Carlson respectively on April 1, 2017, April 1, 2018, and February 27, 2019, were offered into evidence. Copies of Form AFR-A, approved by the Bergen County Board of Taxation and Director, for the 2018, 2019, and 2020 tax years were not offered into evidence.

[9] It is undisputed that Bergen County was not a demonstration county participating under the RPADP for the 2017, 2018, 2019, or 2020 tax years. Therefore, Hackensack was not eligible to conduct an annual reassessment program under N.J.A.C. 18:12A-1.14(i) for the 2017, 2018, 2019, and 2020 tax years.

15

application for an annual reassessment program for the 2017, 2018, 2019, and 2020 tax years.

Accordingly, applying the holding reached in Pella Realty, LLC to the instant matter, Hackensack was not eligible to conduct an annual reassessment program for the 2017, 2018, 2019, and 2020 tax years, under N.J.A.C. 18:12A-1.14(i).[10] Thus, Bloomingdale's charges that due to such ineligibility, no presumption of validity should attach to the subject property's 2017, 2018, 2019, and 2020 local property tax assessments.

However, the court finds that whether Hackensack was, or was not, authorized to embark on an annual reassessment program is not singly decisive on the issue of whether a presumption of validity should attach to the local property tax assessments in these matters. Despite the nomenclature or title that may be assigned the task or program of annually evaluating all improvements or line items on a taxing district's tax roll, Hackensack's assessor nonetheless bore a constitutional and statutory duty to annually ensure that all property within the taxing district was assessed at a value "consistent with the purpose of securing uniform taxable valuation of property according to law for the purpose of taxation. . . ." N.J.S.A. 54:4-23.

---

[10] In Mr. DelGuercio's opinion, Hackensack's annual reassessment program, under N.J.A.C. 18:12A-1.14(i), should be viewed as a full or district-wide reassessment program under N.J.A.C. 18:12A-1.14(c). According to Mr. DelGuercio, "[w]e've learned now that the State no longer wants us to fill out that form [AFR-A]. They want us to fill out the AFR form because the confusion was that we were applying for a full reassessment. We did complete and did all the work for a full reassessment in 2017 but now this is the form they wanted us to put it on at that point in time so we put it on that. And, unfortunately -- not unfortunately, but I no longer fill out those forms [AFR-A] for these reassessment programs . . . What we're doing now is, if you remember the AFR form or the first two statements -- first one speaks to exterior [inspection] and there's two boxes you can check, agree or disagree. The second one is the interior inspections and there's two boxes you can check, agree or disagree. What we're doing now is we're checking the first statement agree and then the second statement where it speaks to the attempt for interior, we're checking disagree and we're including an addendum which says we're not going to knock on -- we're not going to attempt to get into 100% because we just did this the year before, we got into "x" amount, in some cases three, four, six months earlier, and so they can either accept that or they can tell us we're not going to approve it -- you have to do -- at that point, I let them dictate what they're requirement is."

Thus, if the court finds that for the 2017, 2018, 2019, and 2020 tax years Hackensack's municipal tax assessor, with the assistance of ASI, relied on available market data and employed reasonable methodologies in carrying out his constitutional and statutory duties, under N.J.S.A. 54:4-23, then the presumption of validity will attach to the subject property's tax assessments. Conversely, if the court finds that Hackensack's assessor arrived at the subject property's tax assessments for the 2017, 2018, 2019, and 2020 tax years employing an arbitrary, capricious, or inherently flawed process, then the presumption of validity will not attach.

Accordingly, the court must examine and scrutinize the reasonableness of the data and methodology employed by the assessor in determining each year's local property tax assessments. As stated by our Supreme Court, such evaluation should

> focus solely on whether the valuation could reasonably have been arrived at in light of the data available to the assessor at the time of the valuation. Encompassed within this inquiry are (1) the reasonableness of the underlying data used by the assessor, and (2) the reasonableness of the methodology used by the assessor in arriving at the valuation.
>
> [Ocean Pines, Ltd. v. Borough of Point Pleasant, 112 N.J. 1, 11 (1988).]

C. Presumption of validity

In addressing local property tax grievances, our courts have adhered to a longstanding principle that a

> presumption [exists] in favor of the correctness of the estimation made by the assessor, the sworn officer, and before a tax can be disturbed on the ground alleged, the burden is put upon the objector to show by his proofs a clear error in such estimation. When the testimony does not decidedly bear against the correctness of the assessor's action, the court cannot disturb it.
>
> [State v. Hawkens, 50 N.J.L. 122, 125 (1887).]

See also L. Bamberger & Co. v. Div. of Tax Appeals, 1 N.J. 151, 159 (1948); Riverview Gardens,

Section One, Inc. v. Borough of N. Arlington, 9 N.J. 167, 175 (1952); Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 104-05 (1952); Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38 (App. Div. 1982).

As explained by the court in City of Elizabeth v. 264 First St., LLC, the rationale underpinning this core principle is that government action should be presumed valid,

> the public [has an] expectation that a municipal tax assessor will act scrupulously, correctly, efficiently and honestly in complying with statutory provisions and adhering to standards of fairness when making assessments. Our Supreme Court has demanded that 'government officials act solely in the public interest. In dealing with the public, government must 'turn square corners'. . . [i]t may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity. . .'
>
> the '[p]roper administration of our tax laws and the successful implementation of statutes [are] designed to . . . demand consistency and fairness from municipal officers in their dealings with property owners.' Legislative goals could be undermined if a municipality was permitted to exercise its duties inconsistent with the concepts of fundamental fairness. Taxpayers have a right to expect the municipal assessor to comply with statutory provisions and adhere to standards of fairness when making assessments. A taxing district 'does not stand in the same shoes as an ordinary citizen [and] the municipality and the aggrieved taxpayer are not to be analogized to private litigants competing through the judicial machinery for a tactical advantage.'
>
> [28 N.J. Tax at 448-49 (citations omitted).]

In carrying out those goals, a municipal tax assessor is charged with the annual duty of reviewing and adjusting local property tax assessments. N.J.S.A. 54:4-23 provides, in part, that

> after examination and inquiry, [the assessor shall] determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments. . . .
>
> [N.J.S.A. 54:4-23.]

18

The statute "neither requires nor excludes any specific formula for measuring fair value." Riverview Gardens, Section One, Inc., 9 N.J. at 175. The tax assessor's duty to determine the full and fair value of all property in the taxing district arises annually, and "[e]ach annual assessment and . . . each annual valuation, of property for taxation constitutes a separate entity, distinct from valuations and assessments of previous or subsequent years." Rodwood Gardens, Inc., 188 N.J. Super. at 38.

Here, according to Mr. Carlson, for the 2017, 2018, 2019, and 2020 tax years, ASI "attempted 25% [interior inspections] each year . . . over a four-year period." Mr. DelGuercio's testimony further confirmed that exterior inspections of 100% of Hackensack's line items were conducted each year and that 25% interior inspections were attempted each year during the 2017, 2018, 2019, and 2020 tax years.[11] According to Mr. DelGuercio,

> knowing that I have a contract for, say, four years, knowing that I have to accomplish 25% percent per year, meaning that at the end of the four years . . . everybody has an attempt at an interior at least once within that four-year period. What I do is I break out -- split the town into, say, four quadrants, right? But we do skip around because a lot of time we're getting into these homes because added assessments are done. A lot of times we're getting in through these homes because, you know, they're current county or tax court appeals pending. A lot of times people call because they want us to

---

[11] Initially, Mr. DelGuercio testified that "[t]he attempt to physically do the interior aspect is made on only 20% as opposed to 100% percent the year before [2016]." However, his later testimony confirmed that interior inspections were attempted each year on 25% of Hackensack's line items. Mr. DelGuercio testimony revealed that interior inspections were attempted on: (i) 2,449 line items for the 2017 tax year; (ii) 2,549 line items for the 2018 tax year; (iii) 3,180 line items for the 2019 tax year; and (iv) 3,204 line items for the 2020 tax year. Moreover, Mr. DelGuercio credibly explained why there were discrepancies between ASI's inspection logs and the Plans of Work submitted to the Bergen County Board of Taxation. According to Mr. DelGuercio, ASI's inspection logs are "living documents" that "change[] daily based on . . . phone calls that come in to do inspections, inspections that take place." Conversely, the Plans of Work submitted to the Bergen County Board of Taxation represented interior inspections performed as of a fixed date. Thus, the court concludes that Mr. DelGuercio's initial statements as to the percentage of interior inspections attempted under Hackensack's annual reassessment program were a misstatement.

19

get in when we didn't before. So, we do skip around and that's why we kind of keep track of everything. By the end of the four-year period, everybody will have been attempted at least once. And I think that the relief is I think it's a little too egregious to be demanding to get into the same home each and every year four years straight.

Moreover, Mr. Carlson testified that under Hackensack's annual reassessment program, ASI bore responsibility to,

formulate[] the values. They're the contracted employee[s] . . . we pay them money to go out and inspect the properties and then after they inspect the properties the first time around they come up with 25% inspections after that over the four-year period, . . . they come up with the values, . . . and they give [me] the spreadsheets, what they've come up with, the old assessment and then the new assessment, the type of property, the address, . . . the sale prices, they analyze the sale prices . . . So I'm on top of it, you know, and like I said we sit down. ASI is the one that formulates the numbers. They do the sales analysis, I don't, and then I'll double check [it].

During his testimony, it became clear to the court that Mr. Carlson relied on ASI's appraisers and Hackensack's appraiser, McNerney & Associates, Inc., to provide him with the market data and analysis to determine the subject property's 2017, 2018, 2019, and 2020 tax year assessments. According to Mr. Carlson, ASI presents him with "a spreadsheet on the residential . . . and the commercial properties. We go through them. We certainly go through the assessed valuations, usually, you know, in a timely manner obviously before the final [tax assessment] numbers are finalized."

Mr. Carlson explained that the spreadsheets contain, "an analysis and a listing. It's a courtesy [cursory] glance. It's not as detailed, but it is an analysis. It has the square footage and the percentages, and how much it is per square foot, and the sale prices and so forth." According to Mr. Carlson, the spreadsheet

breaks it down to residential properties, condominium properties, commercial properties, 4A, 4B, 4C categories for the commercial

20

properties. It gives me the block, the lot, name of the owner, the taxpayer, the address. It gives me the square footage. It gives me the price per square foot. It gives me sale price per square foot. It gives us the sale price. It gives me the assessment of the prior year and the following year. It gives me the percentage increase or decrease. It gives me the assessed valuation per unit basis, and it also gives me per square foot basis. It has notes that could be applied to it, you know, individual properties.

Specifically, "on . . . a residential neighborhood or a condominium complex, it would give you all the sales that occurred within the last year and a half, . . . so I could have some type of idea what the market is, which direction or trend the market is going on the residential properties."

However, with respect to the commercial properties,

[it] is segmented more . . . it would give me a range. It would give me . . . the block and lot, address, the square footage of the property. If there was a sale, how much it had sold for per unit, if there's an apartment, if there was a sale, what the square footage per -- say if it was retail, how much -- what it sold for per square foot, and then it would give me the assessed valuation per square foot, so it would give an indicator of where we are as far as in coordination with the sale prices.

Mr. Carlson further offered that after he is provided with the "spreadsheet. I go through it with experts to go through it if it's correct or not." After being furnished with the annual reassessment worksheets by ASI, Mr. Carlson testified that he,

ask[s] questions. I ask questions. I ask is this the right value, and is this the right square footage, do you have the, you know, the right numbers, how come this one is a little bit higher than last year -- how come this one is a little lower than last year. It's not like I walk into the room and say, okay, whatever you guys give me, I'm fine with it. I do ask questions, and I ask the experts. You know, we all sit down with [Mr.] McNerney's office and we go through them.

In addition to being provided worksheets, Mr. Carlson testified that ASI provides him with Marshall & Swift cost worksheets for each of the approximately 1,600 commercial properties. Admittedly, Mr. Carlson offered,

21

[d]o I go into microscopic detail on every single one [commercial property cost worksheet]? No, that's why I have experts. That's why I have appraisals. That's why I ask for an analysis to make sure I get the numbers correct. If the numbers aren't correct, I raise them. If a mistake is made, I lower them.

Moreover, although the Marshall & Swift cost worksheets in his files did not contain a land value analysis, Mr. Carlson stated that,

yeah, there's . . . an analysis . . . There's an analysis of percentage increase, or percentage decrease, or the sale price differentials. There's a range of like what an apartment -- how much a unit would be, like for per unit value based on sale price. Yeah, there's an analysis done, but it's done by ASI.

Moreover, when a property was the subject of a local property tax appeal, Mr. Carlson offered that,

[t]he discussion would be more elaborate. The discussion would be more in detail if they were under appeal because . . . I want to get the assessments correct. So, if the assessments too high or too low, and under appeal especially, I want to know if I should hold the assessment, should I raise the assessment -- what do you guys [ASI and Mr. McNerney's office] think. It's an open-ended discussion on all the commercial properties.

Mr. Carlson further explained that "[Mr.] McNerney's office is my expert where . . . I go through the numbers with them also multiple times to make sure they're correct . . . [for the] commercial properties . . . we have a separate spreadsheet for the commercial properties and we look at them."

The court found particularly telling, Mr. Carlson's opinion that,

I have 1,600 [commercial] properties. If I had ten errors of 1,600 [commercial] properties year after year, I think that's pretty good. I mean, I'm not saying I'm perfect, but, again, the [Director's sales] ratio will bear me out. I'm at 93%, 94% with the county ratio . . . Again, it's mass appraising. We're doing -- looking at numbers. We're looking at the evaluation each year separately.

With respect to the subject property's local property tax assessments, Mr. Carlson testified

22

that other than discussions with ASI's appraisers, Mr. McNerney's office's appraisers, spreadsheets prepared by ASI, the Marshall & Swift cost worksheets, and the appraisal reports prepared by Mr. McNerney's office, he did not rely on any other documents in determining the subject property's local property tax assessments during the tax years at issue.

Specifically, with respect to the subject property's 2016, 2017, and 2018 local property tax assessments, Mr. Carlson testified that ASI determined that value, and he "reviewed it. I didn't change it. I reviewed it. Went through it." Mr. Carlson expressed that ASI furnished him with the subject property's "Marshall & Swift [cost worksheet data for the] property record card." However, according to Mr. Carlson, the cost worksheets,

> will not match -- I don't think it will match the [tax] assessment. Those three years [2016, 2017, and 2018] -- it looks like I went from the spreadsheet, the . . . numbers they [ASI] gave me for the first three years, [20]16, [20]17, and [20]18, that won't match the [local property tax] assessment[s]. That's [the cost worksheets are] higher than the assessment[s]. As a matter of fact, probably the assessment should have been raised sooner, but we missed it.

According to Mr. Carlson, the subject property's 2016, 2017, and 2018 tax year "assessed valuation on the [ASI] spreadsheet was less, significantly less than the [Marshall & Swift] cost approach [worksheets] that I had gotten from ASI." Although Mr. Carlson recognized the inconsistency between the ASI spreadsheet values and the Marshall & Swift cost worksheet values, in his opinion, "the inconsistency is in favor of, . . . the taxpayer," thus, he accepted the lower assessed value

Mr. Carlson testified that during each year that the subject property's local property tax assessment was adjusted upwards (2017, 2018, and 2019), he relied on market data, analysis, and advice furnished by ASI and Mr. McNerney's office. In his own words,

> I rel[ied] on my experts to give me advice on the malls and the anchors. I don't have the detailed information as the assessor to go

through microscopically every single mall or sale or transaction or the trends . . . the analysis was, you know, it was done for a purpose. It was to verify that the [assessment] numbers should be increased.

During a meeting discussing the 2019 tax year assessments, Mr. Carlson stated that,

> when I sat down with McNerney's office and ASI . . . we went through the commercial properties, the spreadsheets, and it came to our attention, actually it came from . . . [Mr.] McNerney's office, they said that Bloomingdale's is underassessed, it should be higher, and that's what we talked about . . . and then I had an analysis done to make sure because before I raise something, especially if I raise something that's, you know, going to be an impact, I like that analysis done. So I had McNerney's office . . . [perform] an analysis, and they came in with a higher number than -- Bloomingdale's was I think at $41 million or $42 million the first year . . . [t]hen it moved up to $47 [million], then to $51 [million] over a three-year period, and then in [20]19 it was moved up to $70 [million], even though McNerney's office, the appraiser said it was worth between $77 to $80 million. I thought that was too high. Again, I used my judgment here and said that impact is too much, and I like to go a little light on commercial properties, so, you know, just in case they have an appeal, or just in case they run into some financial problems. I don't like to hit people really, really hard, a hundred percent. I try to nuance it a bit. So I brought the assessment down to $70 million even though the numbers they [McNerney's office] I believe were $77 and $80 million. Even the appraisals I think are at that number.

Finally, Mr. Carlson stated that before he increased the subject property's 2019 tax year assessment he asked,

> [Mr.] McNerney's office to do an analysis on this particular [subject] property . . . before I raised [it] in [20]19 because it was -- it went from a, you know, $47 to $50 million to $70 million [assessment]. They came in with a number I believe was $77 million or $80 million, but of course I asked for an analysis.

In gauging the reasonableness of the local property tax assessments, "[b]oth the underlying data and the methodology used by the assessor are entitled to [a] presumptions of correctness." 510 Ryerson Rd., Inc. v. Borough of Lincoln Park, 28 N.J. Tax 184, 193 (Tax 2014). The taxpayer shoulders the burden of proving "the methodology utilized in [arriving at] the original assessment

24

manifested an arbitrary or capricious discharge of the assessor's responsibilities and "provide[d] no reliable indication that the quantum of the assessment [was] itself reasonable." Transcon. Gas Pipeline Corp. v. Bernards Twp., 111 N.J. 507, 538 (1988). As stated above, the focus of the court's inquiry centers on whether the valuation of the property, and determination of the tax assessment, was reasonably related to sound assessment practices, based on reasonable data and information, were sensitive to changing market conditions, and considered physical factors uniquely applicable to the property. Id. at 537-38.

Accordingly, Bloomingdale's bore the burden of proving that Hackensack arrived at the subject property's 2017, 2018, 2019, and 2020 local property tax assessments in an arbitrary or capricious manner or were the result of an inherently flawed assessment process. However, Bloomingdale's offered no evidence that the market data, analysis, and/or methodology employed by ASI and Mr. McNerney's office and relied on by Hackensack's tax assessor in determining the subject property's assessments were flawed.

Rather, the court finds from the testimony and evidence elicited during phase one of trial that for the 2017, 2018, 2019, and 2020 tax years, Hackensack's tax assessor adhered to his statutory obligations, under N.J.S.A. 54:4-23. Data about each property in Hackensack was collected and analyzed by ASI and presented to the assessor for review, including information about each property's block and lot, address, the size of the improvements, the price per square foot, the sales price per square foot (if any), the prior year assessment information, and the assessed value on a per unit basis. In addition, an analysis of Hackensack's land values was undertaken by ASI and presented to the assessor. Moreover, with respect to the residential properties, data and information on comparable residential sales occurring within the prior eighteen months was analyzed by ASI and presented to Mr. Carlson. Further, with respect to commercial properties,

25

information was collected and analyzed about property sales, unit prices, and values per square foot. Additionally, a cost approach analysis was undertaken by ASI of all of Hackensack's properties, deriving the estimated replacement cost value of the improvements. Finally, Hackensack retained its appraiser to perform an independent analysis and appraisal of the subject property before determining the subject property's 2019 tax year assessment. In sum, the court finds that Hackensack's assessor complied with his statutory obligations, under N.J.S.A. 54:4-23, of annually revisiting and revising Hackensack's local property tax assessments, as reasonably necessary, to account for changing market conditions to ensure equality in the sharing of the tax burden.

Therefore, for the above-stated reasons, the court rejects Bloomingdale's argument that no presumption of validity should attach to the subject property's 2017, 2018, 2019, and 2020 tax assessments. During phase two of trial, Bloomingdale's will shoulder the burden of rebutting the presumption of validity that attaches to the subject property's local property tax assessments by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co., 10 N.J. at 105.

### III. Conclusion

For the above-stated reasons, the court rejects Bloomingdale's argument that no presumption of validity should attach to the subject property's 2016, 2017, 2018, 2019, and 2020 tax year assessments.